**UNITED STATES of America, Appellee,**

v.

**Richard J. RABBITT, Appellant.**

**No. 77–1677.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1978.

Decided Sept. 5, 1978.

Rehearing and Rehearing En Banc Denied Oct. 27, 1978.

1016

Alan G. Kimbrell, of Rosecan, Kimbrell & Witzel, St. Louis, Mo., for appellant; Mortimer A. Rosecan, St. Louis, Mo., on brief.

Terry I. Adelman, Asst. U. S. Atty., St. Louis, Mo., for appellee; Robert D. Kingsland, U. S. Atty., Stephen B. Higgins, Asst. U. S. Atty., on brief.

Before BRIGHT and HENLEY, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

BRIGHT, Circuit Judge.

Richard Rabbitt appeals from a jury conviction on eleven counts of mail fraud in violation of 18 U.S.C. § 1341 (1976), and three counts of extortion and one count of attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (1976). The district court sentenced Rabbitt to serve seven years' imprisonment and five years' probation and to pay $18,000 in fines. Rabbitt asserts several claims of reversible error revolving around two themes: (1) that adverse rulings of the trial judge concerning joinder and the admissibility of evidence rendered the trial unfair, and (2) that the prosecution failed to meet its burden of proof on certain essential elements of the case.

This prosecution calls into question Rabbitt's allegedly corrupt conduct as a Missouri state legislator. This appeal compels us to consider again [1] the extent to which the federal mail fraud statute, 18 U.S.C. § 1341 (1976), and the Hobbs Act, 18 U.S.C. § 1951 (1976), may be employed by federal prosecutors as one means of bringing allegedly corrupt nonfederal officeholders to trial in the federal courts on criminal charges.

In this case we set aside convictions on ten mail fraud counts and one Hobbs Act extortion count and sustain convictions on one mail fraud count and three Hobbs Act counts.[2]

## I. Background.

Richard Rabbitt was elected to the Missouri House of Representatives in 1960 and remained a member of the House until 1976. He served as majority floor leader from 1967 through 1972, when he became Speaker of the House. He remained Speaker until he resigned in 1976 to campaign as a candidate for Lieutenant Governor of the state.

Rabbitt's responsibilities as majority floor leader included establishing the time of meeting and order of business of the House of Representatives. As leader, Rabbitt selected the calendar each day and generally assisted the Speaker. As Speaker, Rabbitt presided over the house-assembly, appointed

---

* TALBOT SMITH, United States Senior District Judge, Eastern District of Michigan, sitting by designation.

1. See United States v. Brown, 540 F.2d 364 (8th Cir. 1976); United States v. McNeive, 536 F.2d 1245 (8th Cir. 1976); United States v. States, 488 F.2d 761 (8th Cir. 1973), cert. denied, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974).

2. The 15 counts in the indictment may be summarized as follows: counts I–X, Berger-Field architects mail fraud counts generated by law firm statements and checks mailed to or by Berger-Field; count XI, Berger-Field-Hobbs Act count generated by Rabbitt's allegedly extortionate demand for ten percent of the fee on state contracts secured through his influence; count XII, S.B. 110–Hobbs Act count generated by the initial $5,000 payment on the $20,000 allegedly extortionate demand from Missouri automobile dealers for legislative assistance; count XIII, S.B. 110–Hobbs Act count generated by the subsequent $15,000 payment of the balance of the $20,000; count XIV, S.B. 110–mail fraud count generated by the mailing of a $5,000 check as a contribution toward the $20,000; and count XV, H.B. 1336–Hobbs Act count generated by Rabbitt's attempted extortion of law business from the trucking industry.

all the members of all committees, including the chairmen of the committees, assigned all bills to committees, and performed other miscellaneous duties.

The criminal charges brought against Rabbitt relate to three occurrences during his public life: (1) his acceptance of an indirect payoff to assist Missouri automobile dealers in obtaining relief from an onerous inventory tax through passage of a measure called Senate Bill 110; (2) his unsuccessful demand for a payoff in the form of law business for assisting Missouri truckers to obtain a bill authorizing operation of heavier trucks; and (3) his agreement to assist the firm of Berger-Field-Torno-Hurley, Architects and Planners, Inc., to obtain State of Missouri architectural contracts.

### A. *Senate Bill 110—Auto Dealers.*

Substitute Senate Bill 110 (S.B. 110), introduced in 1973, proposed a change in the *ad valorem* method of taxation of car dealers' inventories. According to the *ad valorem* system, car dealers were taxed a percentage of the value of the highest inventory during a regular four-month period each year. Legislation to change the tax to a standard amount on each new car sold had been introduced in previous sessions of the legislature but to no avail. Because the automotive industry believed the tax system proposed by S.B. 110 would be more equitable, the Missouri State Automobile Dealers Association decided in 1973 to make a concerted effort to have the bill heard, considered, and passed in that year. The Association assigned Gene Worn, legislative liaison for the Greater St. Louis Automobile Dealers Association, to assist in lobbying to obtain House approval of S.B. 110.

After the Senate passed the bill with no particular difficulty, Rabbitt, in his capacity as Speaker, assigned the bill to the Local Government-Related Matters Committee, a committee generally favorable to the bill and chaired by a personal friend of Rabbitt. Worn spoke with the committee chairman who said the bill would have an early hearing. Worn then asked Rabbitt what, if anything, could be done to expedite the bill's passage. Rabbitt suggested that Worn retain additional legal counsel, recommending his close friend, John Connaghan, an attorney and lobbyist.

Worn conferred with leaders in the Missouri State Automobile Dealers Association, and the group decided to follow Speaker Rabbitt's advice. As the legislative session was nearing its close, the automobile dealers were concerned that their efforts to obtain this industry bill might not bring success in the House without full legislative cooperation. Worn contacted Connaghan, who agreed to speak with Rabbitt about the bill for a nonnegotiable fee of $20,000. Worn hired Connaghan. Based on his experience in the legislature, Worn believed it was wise to follow a House Speaker's recommendation on legislation.

As a down payment, Ben Lindenbusch, a St. Louis automobile dealer, advanced $5,000 in the form of a personal check toward Connaghan's fee. Later the Motor Car Dealers Association of Greater Kansas City mailed a $5,000 contribution in the form of a check for Connaghan to Lindenbusch. Two other $5,000 checks were obtained. Worn delivered the additional $15,000 to Connaghan.

Connaghan performed no lobbying work. He gave this fee to Rabbitt, some directly and the remainder indirectly by check to Rabbitt's law partner-brother, Peter Rabbitt. These funds were deposited in a special account available for withdrawal by Richard Rabbitt. The Rabbitts admitted receiving funds from Connaghan but claimed the money represented referral fees for law business previously assigned to Connaghan.

The record discloses that following the $5,000 down payment, S.B. 110 survived a committee hearing and passed the House. The Governor subsequently voided the legislation as unconstitutional.

As we have previously noted,[3] the incidents relating to S.B. 110 resulted in one count of mail fraud under the mail fraud

---

3. *See* note 2 *supra.*

statute, count XIV, and two counts of extortion under the Hobbs Act, counts XII and XIII.

### B. *House Bill 1336—Overweight Trucks.*

On December 7, 1973, prior to the 1974 Missouri legislative session, George Burruss, a lobbyist for the Missouri Bus and Truck Association, visited defendant Rabbitt at the latter's law office. They discussed House Bill 1336 (H.B. 1336), a bill increasing the permissible weight of trucks on Missouri highways. Rabbitt was noncommittal about whether he would support H.B. 1336. Describing the meeting, Burruss testified:

> [W]e visited awhile, and at some point Mr. Rabbitt indicated that he had added some persons to the law firm and needed some more law business from maybe the truckers or trucking industry, words to that effect.

At the time Burruss did not accord any particular significance to the conversation.

In mid-January 1974, during the legislative session, Burruss approached Rabbitt outside his office in the Capitol Building and asked why H.B. 1336 had not been assigned to a committee. Burruss testified that Rabbitt responded: "Because I haven't gotten any law business yet." Rabbitt ultimately assigned this bill to an unfriendly

committee in which the proposed legislation was buried.

Based on this series of events, Rabbitt was charged with attempted extortion under the Hobbs Act, count XV.

### C. *Berger-Field Architects.*

In 1965, Paul Hurley, a partner in the St. Louis-based architectural firm of Berger-Field-Torno-Hurley, Architects and Planners, Inc. (Berger-Field), and a long-standing personal friend of Rabbitt, approached Rabbitt on behalf of the firm and sought his help in securing architectural contracts for state construction work. Rabbitt offered, for a fee of ten percent from any resulting work, to introduce the firm to people who might be able to secure architectural contracts for it.[4]

The evidence indicates that Rabbitt recommended the Berger-Field firm as competent architects to persons[5] authorized to employ architects for state projects.[6]

During the course of the agreement, the firm credited Rabbitt for some state work it secured. Berger-Field specifically attributed two state projects and one large project from the University of Missouri it received to Rabbitt's influence. Rabbitt also instructed the firm on the procedure to obtain an additional appropriation needed

---

**4.** Persons charged with the duty of selecting architects for Missouri state jobs testified that selection rested on merit and past performance, not on the basis of competitive bid. The state usually paid a standard six percent fee based on total cost. The method of selecting a firm depended on the size of the project. If a firm had done satisfactory work on a project previously, it would be rehired. The state director of planning and construction assigned small projects. He would solicit a proposal from one architect and, if it proved acceptable, that architect would be given the contract. Projects involving more than five hundred thousand dollars were assigned by a committee. The committee would select a firm after interviewing and evaluating architects chosen from a list of between 30 and 50 firms. For work at a state university, the Board of Curators would select a firm after hearing half-hour presentations by each of a number of firms.

**5.** The persons were Mr. Paulus, Chief of Design and Construction for the State of Missouri; Mr. Wilkerson, Director of Prisons; Mr. Cooper, Director of Planning and Construction; and Mr. Roddy, alderman for the 17th ward in St. Louis. Some evidence in the record seems to indicate that Berger-Field also paid Roddy or Rabbitt 10 percent of the St. Louis city architectural contracts.

**6.** The firm employed three techniques to notify Rabbitt of projects in which it was interested. Initially, the firm forwarded a list to Rabbitt. Otherwise it might send newspaper clippings of state projects to Rabbitt and city projects to Roddy. Finally, a member of the firm would review a copy of the capital appropriations bill listing capital improvement projects with Rabbitt and underline those contracts the firm would like to secure.

to cover one of its state projects.[7] The firm paid Rabbitt's ten percent fee in cash[8] and later in the form of a $500 monthly retainer to Rabbitt's law partner, Joseph Dickerson, who would mail a monthly statement to the architects on either personal or firm stationery. When payment arrived, Dickerson would deposit the retainer in his personal account and write a check for a like amount to the law firm of Rabbitt, Rabbitt, and Dickerson. Dickerson did little work for the retainer. The evidence revealed that the architects paid Rabbitt ten percent ($22,538) of the gross fees from both city and state contracts attributable to his influence. This money was paid either directly to Rabbitt or to Dickerson for the benefit of Rabbitt's law firm. In his defense, Rabbitt denied any payoff agreement and attempted to account for payments to the law firm as legitimate collections for law work done without formal billing in earlier years and as proper retainer fees.

The mailings of law firm retainer bills and checks in payment generated the ten mail fraud charges contained in counts I to X. The demand for the ten percent kickback generated an extortion count under the Hobbs Act, count XI.

## II. *Motion to Sever.*

Rabbitt challenges his conviction on two theories of misjoinder. First, he contends that joinder of extortion counts in one situation with mail fraud counts in another constituted misjoinder. Second, he contends that joinder of counts relating to three different situations—S.B. 110, H.B. 1336, and Berger-Field—constituted prejudicial joinder. We do not agree.

7. The evidence indicated the necessary supplemental bill was processed in the routine manner for acquiring extra payments. However, Berger-Field received no funds from this supplemental appropriation.

8. The firm instituted a scheme to generate the necessary capital by declaring bonuses and writing checks to that effect to the partners. The partners each cashed the checks and returned the money to the firm. An associate gave it to Rabbitt.

## A. *Misjoinder.*

■ Rule 8(a) of the Federal Rules of Criminal Procedure[9] establishes the standard for joinder of offenses. If the various counts refer to similar types of offenses or are based on the same transaction or on several transactions connected by a common scheme or plan, joinder is proper. 8 *Moore's Federal Practice* ¶ 8.05[2]. Joinder of offenses under the federal rules is permissive. *Id.* at ¶ 8.05[1]. Misjoinder raises an issue of law. *Id.* at ¶ 14.02[1].

■ The facts of this case fit within Rule 8. All the offenses charged stem from misconduct while Rabbitt was a public official. The circumstances surrounding S.B. 110 and H.B. 1336 may appear unrelated to those surrounding Berger-Field. However, all three can be characterized as connected by a common plan. The charges all originate from Rabbitt's scheme to obtain money because of his power, authority, and influence as a legislator. The principals of the Berger-Field firm testified they sought Rabbitt's political influence as a legislator. The S.B. 110 and H.B. 1336 counts deal with Rabbitt's use of his position as a legislator. Rabbitt laundered his payoffs as legitimate legal fees. The offenses, although distinct, possess sufficient similarity to render joinder appropriate under Rule 8. *See United States v. Adams*, 434 F.2d 756, 759 (2d Cir. 1970); *Finnegan v. United States*, 204 F.2d 105, 109 (8th Cir.), *cert. denied*, 346 U.S. 821, 74 S.Ct. 36, 98 L.Ed. 347 (1953). *Cf. Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960).

Under the circumstances, the district court did not err in refusing severance.

9. Rule 8(a), Federal Rules of Criminal Procedure, reads:
 Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

### B. *Prejudicial Joinder.*

 Rule 14 of the Federal Rules of Criminal Procedure [10] provides for relief from joinder which, while appropriate under Rule 8(a), results in undue prejudice to the defendant. The determination of prejudice rests within the discretion of the trial court. 8 *Moore's Federal Practice* ¶ 14.-02[1]. Denial of severance is not grounds for reversal unless prejudice and abuse of discretion are shown. *See Johnson v. United States*, 356 F.2d 680, 682 (8th Cir.), *cert. denied*, 385 U.S. 857, 87 S.Ct. 105, 17 L.Ed.2d 84 (1966).

 Rabbitt urges that the Government's actual motivation in joining counts on three separate transactions was to cumulate the evidence. To support this allegation, Rabbitt quotes from the Government's closing argument in which the prosecutor stated:

[Y]ou are entitled to consider all the evidence that's been introduced in this case. You don't have to just single out that one particular matter [H.B. 1336 transaction]. You can consider it all.

We must reject Rabbitt's argument. Had the counts not been joined, the evidence demonstrating Rabbitt's corrupt conduct as a legislator would have been admissible as evidence of similar behavior in each of the separate trials. Thus the court's refusal to sever was not prejudicial and cannot be characterized as an abuse of discretion. *See United States v. Hastings*, 577 F.2d 38 (8th Cir. 1978); *United States v. Clayton*, 450 F.2d 16 (1st Cir. 1971), *cert. denied*, 405 U.S. 975, 92 S.Ct. 1200, 31 L.Ed.2d 250 (1972).

### III. *Senate Bill 110.*

The jury convicted Rabbitt on three counts in relation to S.B. 110. One was a violation of the mail fraud [11] statute and two were Hobbs Act violations.[12] Rabbitt makes the following challenges to these convictions: (1) that the Government's evidence was insufficient to establish mail fraud because the use of mails was not reasonably foreseeable; (2) that the district court erred in overruling his motion for judgment of acquittal on one Hobbs Act count as there was no evidence to establish an effect on interstate commerce; and (3) that the court erred in refusing to give any instruction on his theory of defense. We separately consider these claims.

### A. *Mail Fraud—Use of Mails.*

 To establish a violation of the mail fraud statute, 18 U.S.C. § 1341, the Government must prove "(1) a scheme to defraud, and (2) [a] mailing * * * for the purpose of executing the scheme." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Brown*, 540 F.2d 364 (8th Cir. 1976). In *United States v. Brown, supra*, 540 F.2d at 375–76, the court noted "[t]he mailing element of the crime * * * consists of two requirements: (1) that the defendant caused the use of the mails and (2) that this use was 'for the purpose of executing' the deceptive scheme." The defendant need not specifically intend the use of the mails if such use was a reasonably foreseeable

---

**10.** The relevant provisions of Rule 14, Federal Rules of Criminal Procedure, read:

If it appears that a defendant * * * is prejudiced by a joinder of offenses * * * in an indictment * * *, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

**11.** Relevant provisions of the mail fraud statute, 18 U.S.C. § 1341 (1976), read:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, * * * for the purpose of executing such scheme or artifice or at-

tempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever * * * or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail * * * any such matter or thing, shall be fined * * * or imprisoned * *.

**12.** Relevant provisions of the Hobbs Act, 18 U.S.C. § 1951 (1976), read:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by * * * extortion or attempts or conspires so to do * * * shall be fined * * * or imprisoned * * *.

possibility in furthering the transaction. *Pereira v. United States, supra,* 347 U.S. at 8–9, 74 S.Ct. 358. *See also United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 38 L.Ed.2d 603 (1973).

Rabbitt contends the use of the mails in connection with S.B. 110 was not reasonably foreseeable and consequently he should have been acquitted of the mail fraud charge relating to S.B. 110.[13] We disagree.

The Government established that the Motor Car Dealers Association of Greater Kansas City mailed a letter containing a $5,000 check to Lindenbusch. The check, which Worn delivered to Connaghan, was a contribution toward Connaghan's $20,000 fee. Worn served as a liaison for a statewide organization. He hired Connaghan on behalf of the entire group. A request for a $20,000 fee from an organization made up of members residing in different areas of the state would likely produce mailing of checks to make up the fee fund.

We think the evidence was sufficient to establish the mailing charged in the indictment as reasonably foreseeable, and we reject Rabbitt's claim to an acquittal on count XIV.

### B. *Hobbs Act—Effect on Commerce.*

In *United States v. Brown, supra,* 540 F.2d at 371 (1976), we asserted that the three essential elements of an offense under 18 U.S.C. § 1951 were: "(1) that the defendant induced his victims to part with property; (2) that he did so by extortionate means; and (3) that interstate commerce was thereby affected."

Rabbitt contends that because Lindenbusch's $5,000 payment was in the form of a personal check drawn on his private account, interstate commerce was not affected.[14] Additionally, any commerce connection was too remote to bring Rabbitt's conduct within the Hobbs Act. We reject this attack.

The plain language of the Hobbs Act proscribes extortion which "in any way or degree obstructs, delays, or affects commerce." *See* note 12 *supra.* The Supreme Court has stated that the Hobbs Act "speaks in broad language." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). The connection with interstate commerce need only be slight. *See United States v. Culbert,* 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978). A threatened effect on interstate commerce is sufficient to bring the statute into play. *United States v. Staszcuk,* 517 F.2d 53, 59 (7th Cir.), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). If the resources of a business which affects interstate commerce are depleted and diminished as a result of extortion, then interstate commerce is affected. *United States v. Biondo,* 483 F.2d 635, 640 (8th Cir. 1973), *cert. denied,* 415 U.S. 947, 94 S.Ct. 1468, 39 L.Ed.2d 563 (1974).

There can be no doubt that the Missouri State Automobile Dealers Association was involved in interstate commerce. The subject matter of S.B. 110 was the method of taxation of dealers' inventories of new cars which presumably had come through interstate distribution channels. Ben Lindenbusch, president of the association, testified he had participated in the decision to hire Connaghan and it became his duty to raise Connaghan's fee. In advancing the $5,000 payment, Lindenbusch was acting on behalf of the auto dealers association. Subsequently, the member automobile dealers reimbursed Lindenbusch. The association members were engaged in interstate commerce and their contributions were related to their business of selling automobiles. Lindenbusch's transaction as an agent for this organization establishes sufficient nexus with interstate commerce to bring the extortionate practice within the Hobbs Act. *See United States v. Brown,* 540 F.2d 364 (8th Cir. 1976); *United States v. Mazzei,* 521 F.2d 639 (3d Cir.), *cert.*

---

**13.** Rabbitt does not attack the sufficiency of the evidence of a fraudulent scheme.

**14.** Rabbitt makes no attack on the adequacy of the Government's proof on the first two elements.

denied, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *United States v. Staszcuk*, 517 F.2d 53 (7th Cir. 1974), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975); *United States v. Biondo*, 483 F.2d 635 (8th Cir. 1973), *cert. denied*, 415 U.S. 947, 94 S.Ct. 1468, 39 L.Ed.2d 563 (1974).

### C. *Jury Instructions—Theory of Defense.*

▮▮▮▮ "A defendant is entitled to an instruction on his theory of the case if there is evidence to support it and a proper request is entered." *United States v. Brown*, 540 F.2d 364, 380 (8th Cir. 1976). However, the court is entitled "to use its own language in framing instructions." *United States v. Nance*, 502 F.2d 615, 619–20 (8th Cir. 1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975). Consequently, it is sufficient if the charge to the jury adequately and correctly covers the substance of the requested instruction. *See United States v. Brown, supra*; *United States v. Nance, supra.*

Rabbitt contends that the district court erred in refusing to give any instruction on his theory of defense as to the counts dealing with S.B. 110. In refusing to give Rabbitt's proffered instruction,[15] the court stated, "I don't believe it is necessary to give it. I think it is covered by the instructions presently to be given by the court."

The instructions to the jury, taken as a whole, adequately advised that to convict on the S.B. 110 transaction the jury needed to find beyond a reasonable doubt that Rabbitt extorted money through Worn with the aid of John Connaghan.

▮▮▮ We find no error in these instructions nor in the court's failure to adopt the tendered instruction of Rabbitt on this issue. *See United States v. Brown, supra*, 540 F.2d at 380–81; *United States v. Barrett*, 505 F.2d 1091, 1107 (7th Cir. 1974), *cert. denied*, 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975); *United States v. Nance, supra*, 502 F.2d at 619.

### IV. *Berger-Field.*

Rabbitt's conviction on eleven counts relating to his association with Berger-Field included ten counts under the mail fraud statute and one under the Hobbs Act. Rabbitt contends that the district court erred in overruling his motion for judgment of acquittal on these counts because the Government's evidence failed to prove either mail fraud or extortion under the Hobbs Act. We agree and set aside these convictions.

### A. *Mail Fraud—Sufficiency of the Evidence.*

According to this court in *United States v. Brown*, 540 F.2d 364, 374 (8th Cir. 1976), the mail fraud statute can be utilized to prosecute a public official "if he devises a scheme whereby bribes or kickbacks are accepted in the course of conduct of his office, since such conduct operates to defraud the citizens of his government of their right to his honest and faithful service."

▮▮▮ This concept offers a broad interpretation of the mail fraud statute applicable in situations in which the official commits fraud in connection with an affirmative duty of his office. The concept of fraud upon the public may clearly fall within the ambit of the mail fraud statute where dishonest conduct by a public official directly implicates the functions and duties of that official's public office. Whether a showing of dishonesty on the part of a state official, outside his official duties, with no financial loss to the state constitutes a fraud upon the public and thereby statutory mail fraud is, in our judgment, highly questionable. Every case of breach of public trust and misfeasance in office in connection with which some mailing has occurred does not and cannot fall within the confines of the mail fraud statute. In the instant

---

**15.** Rabbitt offered the following instruction:

Unless you are convinced beyond a reasonable doubt that the defendant directed Gene Worn to John Connaghan so that Connaghan could extort money from the automobile dealers, you shall find the defendant not guilty as to Counts XII, XIII and XIV.

case, we hold the evidence does not establish mail fraud within the federal statute.

The indictment charges, in essence, that Rabbitt defrauded the citizens of Missouri by accepting a ten percent commission on architectural contracts awarded to the Berger-Field firm and concealing or failing to disclose his interest in those contracts. The evidence clearly shows that Rabbitt acted unethically and violated his canons as a lawyer,[16] a candidate disclosure statute requiring disclosure of fees received during the preceding twelve months,[17] and possibly a Missouri law rendering "partiality" or abuse in public office unlawful.[18] But such violations, although bearing on intent to defraud, do not in and of themselves establish the substantive crime of mail fraud under 18 U.S.C. § 1341.

In support of its argument that Rabbitt's conduct constituted mail fraud, the Government relies on several cases in which the courts employed various combinations of factors to establish a scheme to defraud cognizable under the mail fraud statute. In each of these cases, the conduct deemed fraudulent deprived the public either of some potential tangible gain such as favorable contracts,[19] or of its right to honest and fair dealing in the conduct of the officer in question,[20] or of its right to disclosure of the officer's interest in the transaction at issue.[21]

16. Rule Four, DR8–101, Code of Professional Responsibility, Missouri Supreme Court Rules, states:

Action as a Public Official

(A) A lawyer who holds public office shall not:

(1) Use his public position to obtain or attempt to obtain, a special advantage in legislative matters for himself or for a client under circumstances where he knows or it is obvious that such action is not in the public interest.

(2) Use his public position to influence, or attempt to influence, a tribunal to act in favor of himself or of a client.

(3) Accept any thing of value from any person when the lawyer knows or it is obvious that the offer is for the purpose of influencing his action as a public official.

17. Mo.Ann.Stat. § 130.035 (Supp.1978) which became effective January 1, 1975, provides:

1. Every candidate shall file reports in writing [with the Missouri Secretary of State] * * *. Each report shall set forth:

* * * * * *

(5) A specific listing of the source, by name and address, of any gifts or income in excess of one hundred dollars received by the candidate or the candidate's spouse or minor children during the preceding twelve months or the time of the last report, whichever is later; and

(6) A specific listing of the source, by name and address, of any gifts, salaries, fees, or other income which for the twelve-month period preceding the filing date individually or in the aggregate exceeds five hundred dollars which has been paid on behalf of or for services rendered by the candidate to any sole proprietorship, partnership or corporation in which the candidate or the candidate's spouse holds an interest of ten percent or more.

18. Mo.Ann.Stat. § 558.110 (1953) (repealed 1977, effective 1979) provides:

Every person exercising or holding any office of public trust who shall be guilty of willful and malicious oppression, partiality, misconduct or abuse of authority in his official capacity or under color of his office, shall, on conviction, be deemed guilty of a misdemeanor.

19. In *United States v. Barrett*, 505 F.2d 1091 (7th Cir.), *cert. denied*, 421 U.S. 964, 95 S.Ct. 951, 44 L.Ed.2d 450 (1974), a county clerk in Chicago, who was responsible for obtaining voting machines and the insurance on them, received commissions on the insurance policies purchased by the county at his discretion. The only companies allowed in the pool to compete for contracts were those willing to supply kickbacks. The court speculated the city might have gotten lower rates equal to the amount of the kickback.

20. In *United States v. Brown*, 540 F.2d 364 (8th Cir. 1976), city building commissioner Brown's office regulated the awarding of contracts. Brown controlled the granting or denying of building permits and safety inspections to the people making payoffs.

In *United States v. Keane*, 522 F.2d 534 (7th Cir. 1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976), an alderman in the City of Chicago, unbeknown to his constituents, used inside information to purchase property and subsequently voted favorably on action for improvement or sale of properties owned by him.

21. In *United States v. Bush*, 522 F.2d 641 (7th Cir. 1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976), the press secretary and director of public relations in the office of the mayor of the City of Chicago owned part

We find none of these factors present in this case. The state officials who awarded architectural contracts did so on merit.[22] There is no evidence that Rabbitt's use of his friendship, position, and influence to aid Berger-Field in obtaining contracts resulted in inferior work, greater expense, or any other tangible loss to the citizens or state.

We also find no evidence that Rabbitt's conduct deprived the citizens of their right to honesty and fairness in the conduct of his official duties. Rabbitt did not, in his official capacity, control the awarding of state contracts to architects. There is no evidence that Rabbitt failed to carry out the duties and responsibilities of his legislative office or leadership positions for the sake of Berger-Field. In this respect, the case resembles *United States v. McNeive*, 536 F.2d 1245 (8th Cir. 1976), in which the chief plumbing inspector for the City of St. Louis accepted unsolicited gratuities from plumbing contractors. While McNeive benefited from his office in a reprehensible way, his conduct neither injured the Government nor affected the performance of his duties and therefore did not violate federal law. We held that McNeive did not commit fraud by defrauding citizens of a right to "honest and faithful service."[23]

Finally, Rabbitt was under no affirmative duty to disclose his interest. The Government refers to no standard of conduct applicable to legislators which clearly required disclosure of Rabbitt's interest in

the Berger-Field contracts.[24] The candidate disclosure act applied to Rabbitt as a candidate for Lieutenant Governor, not to his services as a legislator. Thus, he did not deprive the citizens of any right to disclosure.

■ To affirm the convictions on the Berger-Field mail fraud counts would mean expansion of the statute beyond its application in prior political corruption cases. This we refuse to do. We hold that Rabbitt's motion for judgment of acquittal on mail fraud counts I through X should have been granted. Accordingly, we reverse his convictions on those counts.

**B.** *Hobbs Act—Sufficiency of the Evidence.*

■ The statutory definition of extortion is "the obtaining of property from another, with his consent, induced by wrongful use of * * * fear, or under color of official right." 18 U.S.C. § 1951. The evidence must establish the payment was made under some form of compulsion. *See United States v. Adcock*, 558 F.2d 397, 403 (6th Cir. 1977). However, bribery and extortion need not be mutually exclusive. *See United States v. Hathaway*, 534 F.2d 386, 393 (1st Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). The existence of compulsion is determined by the mental state of the extorted party. *United States v. Adcock, supra*, 558 F.2d at 403. Rabbitt argues the Government failed to

interest in the company which he recommended and which ultimately received several city advertising contracts. Bush was under a duty imposed by Illinois state law to disclose his interest in any city contract. Additionally, a standard of conduct barred city officials from personally benefiting from city business. Bush concealed his interest in the advertising contracts made within the City of Chicago.

In *United States v. Brown, supra* note 20, Brown was under a duty imposed by state statute to disclose his interest in city contracts or work performed by the city.

**22.** *See* note 4 *supra*.

**23.** In rejecting the Government's contention (which relied on several cases cited by the Government on this appeal), Chief Judge Gibson, writing for the panel, said:

McNeive's acceptance of these tips could hardly be characterized as a scheme or artifice. * * * The record reflects that the City of St. Louis did not suffer any tangible or pecuniary injury from McNeive's practice since it received all the money to which it was entitled. There is no evidence that McNeive deviated from the plumbing code in any respect; on the contrary, many of the Government's witnesses described McNeive as a strict enforcer of the code. [536 F.2d at 1251–52.]

**24.** We recognize that *United States v. Brown, supra* note 20, contains language suggesting that public officials in Missouri have an obligation to disclose any interest in contracts. The court in *Brown* relied, however, on a statute requiring disclosure by *city* officials. That statute is not applicable to the present case.

prove he compelled the victims to part with money either out of fear or "under color of official right."

### 1. *Fear.*

The Government alleges extortion by fear of economic injury. Fear of economic loss is sufficient to constitute extortion, *see Callanan v. United States,* 223 F.2d 171, 175–76 (8th Cir.), *cert. denied,* 350 U.S. 862, 76 S.Ct. 102, 100 L.Ed. 764 (1955); *Bianchi v. United States,* 219 F.2d 182 (8th Cir.), *cert. denied,* 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955), even if the interest threatened is only an anticipated one. *See United States v. Addonizio,* 451 F.2d 49 (3d Cir. 1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972).

The record lacks any substantial evidence of "fear" as a basis for the Berger-Field payments to Rabbitt.[25] Neither did the firm believe that state contracts could not be acquired without Rabbitt's introduction. Indeed, evidence indicated Berger-Field had secured state contracts prior to its agreement with Rabbitt and acquired other state contracts during the years here in question without Rabbitt's assistance. The evidence further indicates Berger-Field was a willing collaborator who sought and paid

for Rabbitt's good words to influential people, thus giving Berger-Field access on a friendly basis to state officials who awarded architectural contracts on merit. The principals of Berger-Field all expressed anger, not fear, at hearing of Rabbitt's ten percent demand. One associate described the demand as "poor thanks" after their consistent political contributions and support. Nevertheless, they decided to pay.

### 2. *Under Color of Official Right.*

Extortion "under color of official right" incorporates common law extortion, the taking of money by a public official not due him or his office for the performance or nonperformance of an official function. The term includes the misuse of one's office to induce payments not due the person or his office. *United States v. Hathaway, supra,* 534 F.2d at 394. The official need not control the function in question if the extorted party possesses a reasonable belief in the official's powers. *See United States v. Hathaway, supra,* 534 F.2d 386; *United States v. Mazzei, supra,* 521 F.2d 639; *United States v. Braasch,* 505 F.2d 139 (7th Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 1562, 43 L.Ed.2d 775 (1975).[26]

**25.** At trial, each of the Berger-Field officials was asked why the firm made the 10 percent payments. Hurley stated the firm members believed if they did not pay Rabbitt, he would not introduce them, and they would have to find someone else. Field stated payments were made to a politician in exchange for his help. Torno stated that he thought failure to pay Rabbitt "was the same as failure to obtain any work from the state government * * * at least through that source." Berger stated Rabbitt had said he would help the firm and "do what he could to get the firm state work and charge a ten percent fee." Berger stated he thought if the firm did not pay it would not get Rabbitt's assistance "helping * * * get state work."

**26.** *Hathaway* involved a no-bid personal service contract over which the defendant had little, if any, control. However, the evidence clearly indicated the extorted party had a reasonable belief he had to pay the extorted amount in order to secure any contract. The defendant represented he was able to control the contracting involved.

The facts in *Mazzei* indicate defendant displayed an intimate knowledge of the state leasing procedure. At an initial meeting between defendant and Kelly, a person seeking to lease space to the Bureau of State Lotteries, defendant stated: "[I]t was the practice on all state leases that a ten percent of the gross amount of the rentals would be paid to a senate finance re-election committee." 521 F.2d at 641. During the course of a second meeting, on Kelly's premises, a representative of the Department of Property and Supplies appeared to inspect the premises. Defendant took an active part in the leasing process. He suggested the rental rate to be included in Kelly's proposal. When the proposal came in with a lower rate, defendant called Kelly and told him to include janitorial services and to charge the suggested rate. Without ever having submitted a higher proposal, Kelly was awarded the lease at the higher rate and requiring janitorial services. Ample evidence exists to support the conclusion that Kelly entertained a reasonable belief defendant controlled the awarding of state leases.

In *Braasch,* a police commander extorted protection money from liquor establishments.

■ In the present case, the Government does not contend that Rabbitt possessed actual power to award contracts for architectural services within his legislative powers or that Rabbitt so intimated. The Government argues that Rabbitt possessed the apparent power to award contracts and that Berger-Field believed in Rabbitt's power to secure contracts for the firm. The evidence, however, does not support that argument. All the principals of Berger-Field knew Rabbitt did not award contracts in his official capacity. Each architect knew the most Rabbitt could do was recommend them to state contractors as qualified architects and thereby gain them a friendly ear. Moreover, while Rabbitt's influence obviously helped these architects obtain state jobs, no testimony established that any state contracting officer awarded any contract to Berger-Field because of Rabbitt's influence or that Berger-Field believed Rabbitt's introduction was enough to secure the work. The Government failed to prove Berger-Field entertained a reasonable belief Rabbitt possessed effective control over the award of architectural contracts necessary to establish extortion "under color of official right" in violation of the Hobbs Act.[27]

The evidence received on this count is distinguishable from that on the S.B. 110–Hobbs Act counts. Control over legislation such as S.B. 110 was at the heart of Rabbitt's responsibility in his position as a legislator and House Speaker. We hold Rabbitt's motion for judgment of acquittal on Hobbs Act count XI should have been granted. Accordingly, we reverse his conviction on this count.

He controlled vice raids. His power to request protection money to place a tavern on a list of those guaranteed not to be harassed clearly arose from his official duties.

27. In view of our holding it is unnecessary to reach Rabbitt's contention that interstate commerce was not affected.

28. Rule 404(b) reads:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a

## V. Fair Trial.

### A. Evidence of Similar Acts.

The Government questioned Rabbitt and two other witnesses about money paid to Rabbitt's law firm to gain his support of other legislation. Some of these payments were disguised as retainers, with no law work performed—similar to the Berger-Field "legal retainers." Rabbitt contends the admission of this testimony into evidence denied him a fair trial. We do not agree.

Federal Rule of Evidence 404(b) permits evidence of other acts, similar to the conduct charged in the indictment, to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[28] See 10 Moore's Federal Practice ¶ 404.21[2].

■ The evidence in question bore on issues relating to Rabbitt's method of obtaining money from parties interested in legislation and his scheme of laundering the funds as retainers. See United States v. Adcock, supra, 558 F.2d 397. The admission of such evidence rests within the discretion of the trial judge. 10 Moore's Federal Practice ¶ 404.21[2]. We have reviewed the record and find no error in admitting this questioned testimony. The district court refused admission of testimony of similar import regarding other incidents and, in our judgment, exercised extreme fairness to Rabbitt in ruling upon evidence of the kind here in question.

### B. Standards of Conduct.

Rabbitt contends the admission of two state statutes and a section of the Attorney's Code of Professional Responsibility[29] into evidence denied him a fair trial.[30]

person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

29. See notes 16, 17, 18 supra.

30. Rabbitt's argument concentrates on the Berger-Field mail fraud counts, which, in view of our ruling, need not be discussed. However, as

According to this court in *United States v. Brown, supra*, 540 F.2d 381, state statutes, ordinances, and codes establishing a standard of conduct are admissible evidence in a prosecution of a public official for mail fraud. An official's course of conduct in the face of such statutes is relevant to the issue of whether that official possessed the requisite intent to defraud the citizens of the state. *See also United States v. Keane, supra*, 522 F.2d at 553–57. The introduction of the statutes was relevant evidence on the S.B. 110 mail fraud count. We see no reason to deviate from the *Brown* standard in this case.

### C. *Rabbitt's Correcting of Testimony.*

Rabbitt contends the court erred in not permitting him to correct an error in his testimony regarding the source of some money deposited in his checking account. We find no merit in Rabbitt's argument.

Rabbitt indicated the source of the deposited money was a bond he had cashed. Evidence indicated proceeds from the bond, in the form of an endorsed check, were used to purchase a coin collection and not deposited in his special account as Rabbitt had claimed. The court permitted Rabbitt to explain that he had inadvertently spoken falsely. Rabbitt apologized to the Government, the jury, and the court. Rabbitt was allowed to make his point; he was not permitted to continue going over it. Within the context of the entire trial, we cannot say the court's ruling constituted prejudicial error.

### D. *Hearsay Evidence.*

In his direct testimony, Rabbitt asserted that part of the monies paid him by Connaghan represented a fee for services rendered in connection with Connaghan's representation of one Wayne England, who had sustained bodily injuries in an automobile accident. Connaghan served as England's attorney of record and settled the case for more than $20,000. In disputing the Government's evidence that a check for $2,000 represented the automobile dealers' payoff on S.B. 110, Rabbitt testified that he gave advice and counsel to England and that Connaghan paid him the $2,000 as his share of the fee earned on settlement. England died prior to this trial.

Wayne England's son, Charles, on rebuttal for the prosecution, testified that he had spoken to his father hundreds of times about the injury case and that he had never heard his father mention Rabbitt as his attorney. This testimony was admitted over Rabbitt's objection as hearsay. Mrs. Wayne England testified and supported the Government's position that Rabbitt had never represented her or her husband in the accident suit. Her testimony was received without objection.

Assuming without deciding that Charles England's testimony constituted inadmissible hearsay, in light of Mrs. England's testimony that Rabbitt never represented the England family on legal matters, especially not on her personal claim and her husband's as a result of the automobile accident, we must deem the error, if any, harmless. *See United States v. Wells*, 525 F.2d 974, 976 (5th Cir. 1976).

We have carefully considered all other challenges made by Rabbitt to the fairness of the trial and find them to be without substantial merit.[31] The record reflects that an able, conscientious judge fairly and calmly presided over this lengthy, hotly contested case, ably tried by counsel for the prosecution and the defense.

We also note that except for challenges to the fairness of the trial and rulings denying severance of counts, Rabbitt does not otherwise challenge the conviction on count

---

we affirm the S.B. 110 mail fraud count, some comment is warranted.

**31.** Both the record and the brief are unclear as to whether the issue challenging the jury instruction in the disjunctive on extortion under the Hobbs Act is confined to count XI involving Berger-Field or includes counts XII and XIII involving S.B. 110. Nevertheless, the indictment alleged and some evidence supported extortion by either fear or under color of official right in counts XII and XIII. Consequently, the trial court did not err in giving this instruction.

XV generated by the events surrounding the overweight truck bill, H.B. 1336.

VI. *Summary.*

We affirm the convictions for mail fraud and extortion under the Hobbs Act generated by the S.B. 110 situation, counts XII, XIII, and XIV. We affirm the conviction for attempted extortion under the Hobbs Act generated by the H.B. 1336 situation, count XV. We reverse the convictions for mail fraud and extortion under the Hobbs Act, generated by the Berger-Field situation, counts I to XI inclusive.

We remand to the district court for entry of modified judgments. We deem it appropriate to vacate all sentences to enable the district court to resentence Rabbitt on the convictions which we have affirmed.

Affirmed in part, reversed in part, and remanded for further proceedings.