# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1741

_____

United States of America,        *
                                    *

            Appellee,       *
                                    *   Appeal from the United States
    v.                       *   District Court for the
                                      *   Eastern District of Arkansas.
Jack Foster,                  *
                                    *

           Appellant.     *

_____

Submitted: November 18, 2005
Filed: April 11, 2006

_____

Before ARNOLD, BEAM, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

A jury convicted Jack Foster (Foster) of aiding and abetting attempted extortion, in violation of 18 U.S.C. § 2 and the Hobbs Act, 18 U.S.C. § 1951. The district court[1] sentenced Foster to 36 months' imprisonment. Foster appeals his conviction, challenging the constitutionality of the Hobbs Act, as applied, and in the alternative, challenging the sufficiency of the evidence supporting his conviction. We affirm.

_____

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

## I.    BACKGROUND

Foster and his longtime friend, Billy Freeman (Freeman), served as elected officials (aldermen) on the Pine Bluff, Arkansas, City Council (Council). The Council consisted of eight elected members, with the mayor serving as chairperson. Four members of the Council were black: Foster, Freeman, Jackie Kirby, and Irene Holcomb (Holcomb). Freeman also served as executive director of the Southeast Arkansas Community Development Corporation (SACDC).

In 2002, the city of Pine Bluff selected the SACDC for three construction projects in Pine Bluff. A grant from the United States Department of Housing and Urban Development (HUD) supplied funding for the construction projects. In July 2002, SACDC needed to pay for completed work, but the HUD grant money had not arrived. Freeman, on behalf of SACDC, requested and received two advances from the city of Pine Bluff, totaling $71,648, to pay the bills. When the HUD grant money arrived, Freeman wrote a reimbursement check to the city of Pine Bluff for $71,648 from the SACDC bank account. On January 2, 2003, the city of Pine Bluff received notice the SACDC's check had been declined due to insufficient funds.

In the summer of 2003, Wilson McDougal (McDougal) planned to purchase the Ramada Inn in Pine Bluff and convert it into an independent living facility for the elderly (the Project). Converting the property with enough parking spaces required the approval of the Council. To survive a possible mayoral veto, McDougal needed six favorable votes from the Council.

An Arkansas state senator told McDougal that Foster and Freeman might be able to help McDougal gain support for the Project. McDougal held a meeting at a restaurant owned by Ed Schull (Schull) to promote the Project. Freeman attended the meeting, talked to McDougal and Schull about the Project, and told them about threats he had received because of a $2,000 debt. Thereafter, McDougal had Schull deliver a $2,000 loan to Freeman.

Foster contacted McDougal and arranged a meeting with McDougal and Freeman to discuss the Project. At McDougal's request, Schull attended the meeting. According to McDougal and Schull, during the meeting, Foster pointed at Freeman and said, "My boy has got a problem with the City," and "I can guarantee four black votes if you can help my boy out." McDougal asked what Freeman needed. Alluding to Freeman's bad check, which was common knowledge in Pine Bluff, Foster answered, "$71,000." McDougal replied he did not have $71,000, but he would call the county attorney, Steve Dalrymple (Dalrymple), about the check.

McDougal told Dalrymple about Foster's offer. Dalrymple told McDougal the Federal Bureau of Investigation (FBI) must be contacted. Later that day, in separate conversations, McDougal told Foster and Freeman that Dalrymple did not have the check, and McDougal could not do anything about it until he did. Freeman remarked that Foster and Holcomb each needed $3,000 in exchange for their votes. Foster told McDougal, "as long as [my] boy Billy Freeman [i]s happy, [I am] happy."

The next day, McDougal met with two FBI agents and agreed to cooperate in an investigation by secretly recording his conversations with Foster and Freeman. On July 10, 2003, McDougal told Foster he had an investor for the Project. They discussed the votes and "making Billy Freeman happy." The next day, Foster told McDougal that Freeman needed $10,000 to make a payment on the bad check.

A few days later, McDougal met with Freeman and paid him $10,000 using FBI funds. Freeman told McDougal he would give $1,000 to Foster. Freeman and McDougal also discussed the future payments of $3,000 to Foster and Holcomb, and $71,000 to Freeman. McDougal met with Freeman again and paid Freeman an additional $8,000. McDougal testified the payments were in exchange for four Council votes.

On July 17, 2003, McDougal videotaped a meeting with Foster. During the meeting, using funds provided by the FBI agent, McDougal handed Foster $2,000,

which Foster put in his pocket. Foster told McDougal he knew Freeman received some money, but said Freeman had not paid Foster the promised $1,000. Foster talked some more about the four Council votes and told McDougal to get Dale Dixon, a white alderman, to sponsor the legislation. Foster said he and Freeman "were going to do what they needed to do." Foster later called and told McDougal that Freeman gave him $1,000.

In cooperation with the FBI, McDougal led Foster to believe McDougal had an investor coming to Pine Bluff from Dallas, Texas. On August 7, 2003, Foster called McDougal and referring to Freeman, Foster reminded McDougal, "Don't forget about my partner. Don't forget about my boy next week . . . when your folks get in town." McDougal arranged to have Foster and Freeman meet with the purported Dallas investor at the Pine Bluff Airport.

Foster, Freeman, and McDougal went to the airport cafeteria, and met an undercover FBI agent posing as the Dallas investor. The FBI agent secretly recorded the meeting. The men discussed the Council votes in favor of the Project, Freeman's unpaid debt to the city of Pine Bluff, and the necessity of Freeman being on the Council. The FBI agent outlined the future and past payments to Foster and Freeman. Foster did not deny receiving money.

The men left the airport cafeteria and, for privacy, boarded the FBI agent's airplane. The agent handed Foster and Freeman each an envelope containing $5,000 in cash. Foster put the money in his pocket, handed the FBI agent a business card displaying Foster's Council alderman position, and said, "We are committed to working this out."

After the meeting at the airport, Foster continued to contact McDougal to ensure "his boy was taken care of." McDougal made his last call to Foster on September 26, 2003, and told him Freeman had been paid.

On December 3, 2003, a grand jury indicted Foster and Freeman for aiding and abetting attempted Hobbs Act extortion under color of official right, in violation of 18 U.S.C. §§ 2 and 1951. In May 2004, Freeman pled guilty and agreed to cooperate with the government in the case against Foster. The district court sentenced Freeman to 13 months' imprisonment and ordered him to pay $350,000 restitution to HUD.

A jury convicted Foster of aiding and abetting attempted extortion, in violation of the Hobbs Act. Following his conviction, Foster filed motions for dismissal, judgment of acquittal, and new trial. The district court denied the motions and sentenced Foster to 36 months' imprisonment.

Foster appeals, arguing an attempted impact on interstate commerce is insufficient to provide subject matter jurisdiction under the Hobbs Act, and therefore the statute was unconstitutionally applied. In the alternative, Foster argues the government did not produce sufficient evidence to prove attempted extortion under the Hobbs Act.

## II. DISCUSSION

### A. Subject Matter Jurisdiction

We first address Foster's subject matter jurisdiction challenge. Title 18 U.S.C. § 3231 states, "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." The grand jury indicted Foster for violating two United States statutes: 18 U.S.C. §§ 2 and 1951. Charging Foster with offenses against the laws of the United States provided the district court with statutory jurisdiction. Foster's challenge to the application and adequacy of proof of the interstate commerce element of the Hobbs Act does not extinguish federal jurisdiction. See, e.g., United States v. Sabri, 326 F.3d 937, 939-40 n.3 (8th Cir. 2003) (concluding federal courts have statutory jurisdiction when a defendant is charged with violating a federal statute, and if the statute has an express jurisdictional element, federal jurisdiction is not lost merely because the government fails to prove that element of the crime) (citing United States v. Ryan, 41

F.3d 361, 363-64, 368 (8th Cir. 1994) (en banc), vacated on other grounds, 227 F.3d 1058, 1064 (8th Cir. 2000)).  The district court properly denied Foster's motion to dismiss for lack of subject matter jurisdiction.

### B.    Hobbs Act as Applied

"We review de novo constitutional challenges to federal statutes."  United States v. Sheikh, 367 F.3d 756, 764 (8th Cir. 2004).

The Hobbs Act states in pertinent part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do . . . shall be fined under this title or imprisoned. . . .  The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951(a), (b)(2).

Foster challenges the Hobbs Act as applied, arguing to allow satisfaction of the interstate commerce requirement of the Hobbs Act by showing a foreseeable impact on interstate commerce reads "the limitations of the federal power under the Commerce Clause out of existence."  Foster contends such overreaching is prohibited by United States v. Lopez, 514 U.S. 549 (1995).

In Lopez, the Supreme Court struck down section 922(q) of the Gun-Free School Zones Act of 1990 as exceeding Congress's authority to regulate commerce. Id. at 551.  As the Court noted, section 922(q) did not contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce."  Id. at 561.  The Court concluded, "'where *a general regulatory statute bears a substantial relation to commerce*, the *de minimis*

character of individual instances arising under that statute is of no consequence.'" Id. at 558 (quoting Maryland v. Wirtz, 392 U.S. 183, 197 n.27 (1968)).[2]

Lopez does not support Foster's argument for several reasons. First, the Lopez Court challenged Congress's Commerce Clause authority to enact a portion of the Gun-Free School Zones Act. Here, Foster concedes Congress had the authority to enact the Hobbs Act. Second, in Lopez, the Court held the challenged section of the statute was fatally flawed, in part, because it lacked a jurisdictional element. The Hobbs Act, on the other hand, contains an express jurisdictional element: "Whoever in any way or degree . . . *affects commerce or the movement of any article or commodity in commerce*, by robbery or extortion or attempts or conspires so to do . . . shall be fined under this title or imprisoned." 18 U.S.C. § 1951 (emphasis added). Third, because the Hobbs Act contains a jurisdictional element, Foster's argument that the government has not shown the required nexus to interstate commerce is merely a challenge to the sufficiency of the government's proof of an element of the offense, and not a challenge to the constitutionality of the statute. The Court's holding in Lopez does not affect the interstate commerce requirements of the Hobbs Act, and therefore Lopez does not support Foster's as applied constitutional challenge.[3] See also United States v. Farmer, 73 F.3d 836, 843-44 (8th Cir. 1996) (holding the limitations to Congress's Commerce Clause authority, recognized in Lopez, have no effect on the establishment of the interstate commerce element of the Hobbs Act).

---

[2]In 1996, Congress rectified the problem by adding a jurisdictional element to section 922(q). See 18 U.S.C. § 922(q)(2)(A). The amended statute has been upheld as a constitutional application of Congress's authority to regulate commerce. See United States v. Danks, 221 F.3d 1037, 1038-39 (8th Cir. 1999) (per curiam) (citing 18 U.S.C. § 922(q)(2)(A) as amended).

[3]Foster also cites United States v. Morrison, 529 U.S. 598, 602 (2000), where the Supreme Court, relying on its holding in Lopez, concluded Congress similarly overreached its Commerce Clause authority in enacting the Violence Against Women Act. As with Lopez, Morrison does not support Foster's as applied constitutional challenge to the Hobbs Act.

For the reasons stated, we conclude the Hobbs Act is constitutional as applied, and the district court properly denied Foster's motion to dismiss.

### C.  Sufficiency of the Evidence Claim: Elements of Attempted Extortion

Foster alternatively challenges the sufficiency of the evidence supporting his conviction for attempted extortion under the Hobbs Act.  Specifically, Foster argues the government failed to prove (1) Foster's conduct had an adverse impact on interstate commerce, (2) Foster extorted property, and (3) Foster acted under color of official right.  We review de novo the district court's denial of a motion for judgment of acquittal.  United States v. Thropay, 394 F.3d 1004, 1005 (8th Cir.), cert. denied, 125 S. Ct. 2283 (2005).  Evidence is sufficient to support the verdict if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 1005-06 (internal quotation omitted).

### 1.  Interstate Commerce

Foster argues the government failed to produce sufficient evidence of an adverse impact on interstate commerce.  We disagree.

First, Foster misstates the government's burden of proving the interstate commerce element–adverse as well as beneficial effects on commerce are proscribed under the Hobbs Act.  See United States v. Kaplan, 171 F.3d 1351, 1357 (11th Cir. 1999) (concluding the language of the Hobbs Act "is broad, and it is evidence that Congress intended to protect commerce from any and all forms of effects, whether they are direct or indirect, actual or potential, beneficial or adverse.  For courts to require the effect on commerce to be adverse would significantly narrow the statute." (footnote omitted)).

Second, our sister circuits have concluded the government satisfies its burden by showing a *potential* effect on interstate commerce.  See, e.g., United States v. Lynch, 437 F.3d 902, 908 (9th Cir. 2006) (en banc) ("The interstate nexus

requirement is satisfied by proof of a probable or potential impact on interstate commerce." (internal quotation omitted)); United States v. Verbitskaya, 406 F.3d 1324, 1335 (11th Cir. 2005) ("A Hobbs Act conspiracy can be proved by showing a *potential impact* on interstate commerce."), cert. denied, 126 S. Ct. 1095 (2006); United States v. Urban, 404 F.3d 754, 765-66 & n.3 (3d Cir.) (concluding "a 'de minimis effect' in an individual Hobbs Act case need only be 'potential'"), cert. denied, 126 S. Ct. 732 (2005); United States v. Re, 401 F.3d 828, 835 (7th Cir. 2005) ("Moreover, the impact on commerce need not be actual; given that the Hobbs Act criminalizes attempts as well as completed crimes, it is enough that the conduct (here, the conspiracy to extort) had the potential to impact commerce."), cert. denied, ___ S. Ct. ___, No. 05-680, 2006 WL 842996 (U.S. Apr. 3, 2006); United States v. Rivera Rangel, 396 F.3d 476, 482 (1st Cir. 2005) ("The government need only show a realistic probability of a de minimis effect on interstate commerce in order to bring extortion within the reach of the Hobbs Act." (internal quotation omitted)); United States v. Perrotta, 313 F.3d 33, 36 (2d Cir. 2002) (recognizing "it is the law in our circuit that if the defendants' conduct produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a prosecution under the Hobbs Act." (internal quotation omitted)); United States v. Toles, 297 F.3d 959, 969 (10th Cir. 2002) (concluding "only a *potential effect* on commerce is required to satisfy the interstate commerce element" of the Hobbs Act (internal quotation omitted)); United States v. Turner, 272 F.3d 380, 384 (6th Cir. 2001) ("When a conspiracy is charged under the Hobbs Act, the government need only prove that the scheme would have affected interstate commerce had it been carried out."); United States v. Brantley, 777 F.2d 159, 162 (4th Cir. 1985) ("The jurisdictional predicate may be satisfied though the impact upon commerce is small, and it may be shown by proof of probabilities without evidence that any particular commercial movements were affected.").

We agree with the other circuits that because the Hobbs Act criminalizes attempt crimes, "it is enough that the conduct . . . had the potential to impact commerce." Re, 401 F.3d at 835. We recognize, however, another panel of our

circuit, in a case involving the prosecution of a completed crime (Interference with Commerce by Violence) under the Hobbs Act, concluded the Hobbs Act requires "an actual effect on interstate commerce, not just a probable or potential impact." United States v. Williams, 308 F.3d 833, 836-38 (8th Cir. 2002). Williams is distinguishable from the present case because Williams involved the prosecution of a completed offense, and the present case involves the prosecution of an attempt crime. That distinction notwithstanding, a conflict with Williams is avoided because the evidence shows Foster's conduct had more than a potential effect on interstate commerce.

At trial, McDougal testified the multimillion dollar Project would have involved (1) soliciting contractors nationwide; (2) ordering construction supplies and materials from outside the state of Arkansas; and (3) securing financing through HUD, a federal agency. More directly, an impact on interstate commerce was demonstrated by Foster arranging the scheme, in part, to help Freeman repay the HUD grant money, and by Foster taking money from the undercover agent in exchange for promised votes, believing the undercover agent was an investor from Dallas, Texas. Viewing the evidence in the light most favorable to the government, we conclude a rational jury could have found Foster's conduct had an actual, and certainly a potential, effect on interstate commerce.

### 2. Color of Official Right

Relying on United States v. Rabbitt, 583 F.2d 1014 (8th Cir. 1978), abrogated on other grounds by McNally v. United States, 483 U.S. 350, 356 (1987), superseded by statute, 18 U.S.C. § 1346, Foster argues there was insufficient evidence he was acting under color of official right, because there was no issue pending before the Council at the time he accepted the money.

Foster's reliance on Rabbitt is misplaced. First, there is no requirement under the Hobbs Act that the official must be acting in response to a pending issue; rather, an official's conduct controls an undertaking for purposes of the Hobbs Act when the property is accepted. See, e.g., Evans v. United States, 504 U.S. 255, 265-68 (1992)

-10-

(concluding the "under color of official right" element does not require an affirmative act of inducement by the official, and "the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts"); United States v. Loftus, 992 F.2d 793, 796 (8th Cir. 1993) ("When a public official accepts money and 'asserts that his official conduct will be controlled by the terms of the promise or undertaking,' that official has received money 'under color of official right within the meaning of the Hobbs Act.'" (quoting McCormick v. United States, 500 U.S. 257, 273 (1991))).

Second, Rabbitt is distinguishable from the present case. In Rabbitt, we reversed one count of a Hobbs Act conviction against a councilman for accepting a fee for introducing an architectural firm to a potential state contractor. Rabbitt, 583 F.2d at 1019, 1028. We concluded the government had not shown the councilman was acting in his official capacity when he introduced the parties, because the councilman did not have the authority to award contracts, nor did the architectural firm reasonably believe he had such authority. Id. at 1028.

The evidence supports the opposite conclusion in the present case. Foster testified that in his capacity as alderman, he voted on issues brought before the Council. Foster also testified he knew McDougal needed a favorable vote from the Council to proceed with the Project. McDougal testified he believed Foster could influence the Council's vote. Foster guaranteed McDougal four votes in exchange for money to help Freeman. The jury heard audio and videotape recordings of Foster telling McDougal that as long as his boy Billy Freeman was happy, he was happy. Another videotape showed Foster taking money from an undercover FBI agent posing as an investor from Dallas, as they discussed the Council's votes. The same videotape showed Foster handing the undercover agent his business card which displayed Foster's position as alderman on the Council, and Foster telling the FBI agent he (Foster) and Freeman "were going to do what they needed to do." During a post-indictment FBI interview, Foster admitted receiving between $1,000 and $10,000 to help Freeman in exchange for Council votes. Foster also admitted knowing Freeman

received money to pay the city of Pine Bluff in exchange for securing Council votes. Foster further admitted telling McDougal that if Freeman was happy, he was happy. We have no trouble concluding the government presented sufficient evidence upon which the jury could find Foster accepted money under color of official right.

### 3. Extortion of Property

Finally, Foster asserts no property was extorted. "[F]or purposes of the 'obtaining of property' requirement, the offense of attempted extortion is complete when the defendant has attempted to induce his victim to part with property." United States v. Frazier, 560 F.2d 884, 887 (8th Cir. 1977). In this case, the testimonies of McDougal, Schull, and the undercover FBI agent, as well as the audio and videotapes, revealed Foster attempted to induce McDougal to part with over $71,000.

For the reasons stated, sufficient evidence supports the jury's verdict. The district court did not err in denying Foster's motion for judgment of acquittal.

## III. CONCLUSION

We affirm Foster's conviction.

_____