RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 17-3868

TAMELA M. LEE,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:15-cr-00445-1—Christopher A. Boyko, District Judge.

Argued:  October 18, 2018

Decided and Filed:  March 18, 2019

Before:  KEITH, CLAY, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Jerome A. Madden, MADDEN LAW PLLC, Washington, D.C., for Appellant. Elliot D. Morrison, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:**  Jerome A. Madden, Virginia W. Hoptman, MADDEN LAW PLLC, Washington, D.C., for Appellant.  Elliot D. Morrison, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

CLAY, J., delivered the opinion of the court in which KEITH and NALBANDIAN, JJ., joined.  NALBANDIAN, J. (pp. 27–29), delivered a separate concurring opinion.

—————————

## OPINION

—————————

CLAY, Circuit Judge. Defendant Tamela M. Lee ("Defendant" or "Lee") appeals from the district court judgment convicting her on six counts after a plea of not guilty and sentencing her to a total term of sixty months' imprisonment.  Counts One through Four concerned conspiracy to commit honest services mail and wire fraud, honest services mail fraud, Hobbs Act conspiracy, and Hobbs Act extortion, in violation of 18 U.S.C. §§ 1341, 1343, 1346, 1349, and 1951. Counts Five and Six concerned obstruction of justice and false statements to law enforcement, in violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 1001.  On appeal, Defendant challenges the sufficiency of her indictment on Counts One through Four in light of the Supreme Court's decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), as well as the sufficiency of the evidence for all of her convictions.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## BACKGROUND

### Factual History

In 2013, Defendant Tamela Lee was sworn in as a member of the Summit County Council to represent District 5 in Akron, Ohio.  She signed an oath of office stating that she would "faithfully, honestly, and impartially discharge and perform all the duties incumbent on" a member of the Council.  (Supplemental Appendix at 90.)  This case concerns Defendant's relationship with Omar Abdelqader ("Abdelqader"), who owned a business in District 5 but did not reside there.  The FBI began investigating the relationship between Defendant in her position as Summit County Councilperson and Abdelqader in October 2013 following complaints that Abdelqader "was insisting on monthly cash payments from other local businesses" that he would give to Defendant in exchange for political favors.  (R. 126, Transcript, PageID # 849–50.) Defendant knew Abdelqader through her husband, and Abdelqader helped support Defendant when her husband unexpectedly left the country for long stretches of time.  Defendant's husband's departure left her in serious financial difficulties, and Abdelqader supported her by

allowing her to take items from his convenience store, paying for services for her, and giving her money.  The FBI obtained wiretaps on both Defendant's and Abdelqader's cellular phones, which allowed the FBI to monitor many conversations and text messages between Defendant and Abdelqader.[1]

### A.  Defendant's Intervention in Assault Case

On June 1, 2014, Abdelqader's nephews, Sharif Hamed ("Hamed") and Samir Abdelqader ("Samir"), were arrested for felonious assault after an altercation with an unidentified man in Akron.  Abdelqader turned to Defendant for help with the matter on June 8, 2014.  He first asked her to attend a hearing for Samir, and when she told him she could not attend, she offered to call or email the judge instead.  In the same conversation, Defendant and Abdelqader discussed Defendant's financial problems, and Abdelqader promised her that they would "work it out."  (R. 126, Transcript, PageID # 911.)  On June 9, 2014, Defendant placed calls to the Summit County Juvenile Court bailiff and the judicial assistant for the Summit County Juvenile Court judge.  In a conversation with his brother (Samir's father) later that day, Abdelqader told his brother that he had discussed the case with Defendant, stating that he had given Defendant two hundred dollars and that he had promised to give her an additional three hundred dollars if she "finish[ed] up this matter for [Abdelqader]."  (*Id*. at PageID # 924–26.)  Defendant deposited two hundred dollars in her bank account on June 10, 2014.

Two days later, on June 12, 2014, Abdelqader texted Defendant.  He reminded her of his nephew's name and stated "Please don't forget to call.  We have court today at 2."  (*Id*. at PageID # 938.)  That afternoon, Defendant placed several calls to the Akron Municipal Court judge who was handling the case and his staff.  Those calls lasted 51 seconds and 5 minutes and 44 seconds, respectively.[2]  The next day, Defendant and Abdelqader discussed the case again.  Abdelqader told Defendant "I really need your help in these two cases . . . with my two nephews."  (*Id*. at PageID # 946.)  When Abdelqader expressed outrage at the charges,

---

[1]The FBI obtained permission to wiretap Abdelqader's phone on June 4, 2014, and it obtained permission to wiretap Defendant's phone on June 21, 2014.

[2]The FBI had not yet begun wiretapping Defendant's phone when these conversations occurred, so the content of these conversations is unknown.

Defendant tried to describe to him why his nephews were culpable "from a legal position," explaining "you have to understand, that by the law of the State of Ohio and the United States of American [sic], when you do that—it's wrong!" (*Id*. at PageID # 947–49.) Defendant suggested that Abdelqader's nephew could try to press charges against the other man in the altercation. Abdelqader told Defendant "the only thing I need from you is, is try to, try to explain to these people what exactly happened." (*Id*. at PageID # 949.) The conversation shifted to Defendant's money problems, and Abdelqader told Defendant to come by his convenience store so he could give her money. Finally, Defendant promised Abdelqader right before they hung up that she would speak with her friend at the prosecutor's office.

On June 14, 2014, Defendant spoke with Abdelqader regarding her calls to the judge and stated that she was "broke." (*Id*. at PageID # 957.) Abdelqader told Defendant to send her daughter to pick up fifty dollars from his store. They also discussed his nephews' case: Defendant told Abdelqader that she had missed calls from the judge and the bailiff, and he asked her to "try to get a hold of them and let them know what's going on." (*Id*. at PageID # 960.)

Shortly before Hamed's hearing on June 17, 2014, Defendant went to the court and spoke with Judge Larson, the judge in the case. Defendant said that she was there as a character witness, incorrectly claiming that Samir was her relative. Defendant then went to discuss the issue with the prosecutor in the case, Marisa Pappas ("Pappas"). Defendant told Pappas that Hamed was her nephew, she wanted to be a character witness for him, and she was on the County Council.

On July 9, 2014, Defendant texted Gertrude Wilms ("Wilms"), the chief city prosecutor for the city of Akron, whom she knew through their mutual involvement in Akron politics. Wilms called Defendant back on July 10, 2014, and Defendant began talking about Abdelqader's nephews' case. Wilms told Defendant "I don't know what we're talking about," and Defendant responded:

> Okay, uh, the boy on Arlington the 17 year old who hit the guy with the car, anyway. Like my favorite, favorite, favorite people. I know Samir, I don't know the other boy. Samir works right here right around the corner from me. But anyway, I had asked them, why did anybody, you know the other guy was 28 and they were 17. I said, "Why wasn't the 28-year-old charged?" And

anyway they said they had come down, the parents came down to um press charges against the 28-year-old. And I just told them, I said, "Well look I'll call Gert, and I'll just tell her what I know." And I'm not trying to influence you, you can't say I'm trying to influence you. I'm trying to make you think. That's all I'm trying to do; just trying to make you think.

(R. 132, Transcript, PageID # 1378.) The conversation continued:

LEE: But, the history with what happened with them and that 28 year old guy who started the fight. I've always known that story. You know, from the boy who works at Lorenzo's, you know I know everybody that works at everybody's store. And that he's a problem. And that he's the one who went into the, he saw their car, and went into the barbershop and started the fight. So this whole thing started because of this 28 year old bully, going in and harassing the 17 and 18 year old boys. And Samir is the nicest, sweetest.

WILMS: Well what happened that Samir got charged?

LEE: Well because the 17 year old, when the police started coming, everyone started running, and the 17 year old was in the car and he was trying to get around the curb to run away, well he actually hit the 28 year old. (UI).

WILMS: With the car?

LEE: Yeah.

WILMS: Okay.

LEE: So, all of their, their case is the 17 year old and the 18 year old, you know, both of their cases, you know, have gone forward because you know when it happened, you know I told them I said, "Look you hit somebody with a car."

WILMS: Yeah.

LEE: There, there's no getting around that, I mean that's just stupid. But Samir he says he "Wasn't trying to hit him," he "Was trying to get away."

WILMS: Okay. Is his case still pending?

LEE: Uh huh.

WILMS: Who is the attorney.

LEE: I don't know who they went and got as their attorney?

WILMS: Okay. So he told his attorney all this and everything. Is this the case that's pending in Larsen's Court?

LEE: Yeah.

WILMS: Okay.

LEE: But they came, the parents came down to press charges against the 28 year old.

WILMS: Whose parents?

LEE:  Both of them, Samir and his cousin, they both came down about a week ago and they were told that it's up to the Prosecutor, whether or not, you know to press charges against the 28 year old.

WILMS:  Alright, I'm going to have to look at this stuff and call you back because none of this story is making sense.

LEE:  Is what?

WILMS:  I'll pull some police reports and I'll call you back.

LEE:  Okay honey and then maybe I'll make more sense when you know what I'm talking about.

WILMS:  Yeah, I don't know exactly what happened so and we usually don't sign charges when the police have made a decision on scene, who they think is the primary aggressor, we don't second guess that, so it's not likely to get charges but I'll look into it.

LEE:  Okay.  Because there were actually two altercations.  Because he came into the barbershop and started the fight and then the barbershop owner told them, you know, to get off their property or whatever.  (OV)  What the witnesses saw, what the witnesses saw was the second, um, altercation—

WILMS: Uh huh.

LEE:  —in the street.  The 28 year old started it and then if you look at like the text message history and all the other stuff, well the 28 year old has been harassing these boys for months.

WILMS:  Okay, let me take a look at it Tamela and I'll call you back.

LEE:  Oh, okay thanks Gert.

WILMS:  Uh huh. Hmm. Bye.

LEE:  Bye bye.

(*Id.* at PageID # 1379–81.)  There was no prohibition on members of the public calling Wilms to discuss a case.  After the call, Wilms checked the case file and discussed it with the prosecutor assigned to the case, ultimately concluding that no charges should be filed against the unidentified man.  Wilms called Defendant back and left her a voicemail to that effect.  Wilms testified that she believed if she did not call Defendant back, Defendant might "go over [Wilms'] head and contact [her] supervisor," the law director.  (*Id.* at PageID # 1388.)

**B.  Defendant's Letter to the IRS**

Abdelqader's friend Malek Albanna ("Albanna") had a son, George Albanna ("George"), who was under investigation by the IRS.  Unbeknownst to Abdelqader and Defendant, Albanna was assisting the FBI in its investigation of Abdelqader and Defendant.  Albanna recorded a

conversation between himself and Abdelqader in May of 2014. In that conversation, Albanna and Abdelqader discussed George's case. Albanna told Abdelqader that a church had written a character letter supporting George. He then asked Abdelqader, "Didn't you once tell me . . . that you'd arrange for me a document, or a letter from her . . . that girl you got . . . she'd be testifying that George is upstanding?" (R. 126, Transcript, PageID # 875.) Abdelqader replied, "I can . . . Yeah! Yeah! Yeah! I can get her . . . to put it in a document . . . . I'll get her to make you a document . . . with a governmental stamp, also." (*Id.*) When Albanna stated "No matter what it costs—I'll pay!", Abdelqader responded "whatever it does cost, I'll pay—because George is my son, man!" (*Id.* at PageID # 876–77.) Abdelqader reiterated later in the conversation, "I'll get her to prepare a document for you, and it would [be] stamped with the stamp of the government." (*Id.* at PageID # 877.)

On June 20, 2014, Albanna and Abdelqader discussed George's case again. Albanna asked, "What happened with the woman in regards to George?" (*Id.* at PageID # 972.) Abdelqader responded, "I swear . . . I can go anytime to get the paper from the woman. She told me: 'Whenever you ready . . . whenever you need it . . . Anytime you need it—the paper is available.'" (*Id.* at PageID # 972–73.) Abdelqader continued, "Do you understand me? She came . . . to the court with my nephew . . . I mean she'd do whatever . . . you know what I mean? . . . I just tell her whatever I want to do. But she said 'Whenever you need it' . . . She tells me, 'I will bring it to you on the same day.'" (*Id.* at PageID # 973.) When Abdelqader mentioned the fact that Defendant had come to his nephews' trial, Abdelqader stated that "her presence did change the entire situation, my man." (*Id.* at PageID # 976.)

On July 26, 2014, Abdelqader and Defendant discussed the letter. Portions of that conversation are included:

> LEE: I didn't get that letter done, or come up there, so,
> ABDELQADER: Mmm.
> LEE: And he didn't send me the letter, he just sent me a d--n blank letterhead, so,
> ABDELQADER: Mmm.
> LEE: I have to re-type it.
> ABDELQADER: Uh huh.

LEE:  And, it's been so long, Omar, I don't even remember.  You have to tell me again, what it is that you need?

ABDELQADER:  Uh, just saying that you know this guy and you know his family, and he's a good, you know, good person, and, you know, your knowledge of them is, you know, they're good people, and, you know, something like that.  Something just to show that you,

LEE:  Okay.

ABDELQADER:  His behaviors and stuff like that, you know?

. . .

LEE:  Okay, now who does this need to go to?

ABDELQADER:  Huh? What is it? Who does it need to go to?

LEE:  Yeah.

ABDELQADER:  Uh, to those, to those - he has an issue with the IRS, so, to the people at, you know, from the IRS, I guess.

. . .

LEE:  What's his name?

ABDELQADER:  George Albanna.

LEE:  George?

ABDELQADER:  Albanna.  Let me, let me, let me send you his name, who it's supposed to go to.

. . .

ABDELQADER:  And this is going to a supervisor, Yory, um, I'm gonna have to, I'm gonna have to send you a text with that.  I can't even -

LEE:  Alright.

ABDELQADER:  I'll send you that's who it's going to.  But, just something about him and you know, you know the Albanna family and they are, you know good people, something like that.  Alright, let me send you a text for where it's going to, but just bring me a copy to the store and if you want me, I'll send it or, if you guys are gonna send it, either way, but I would like to have a copy of it and give it to the parents, alright?  Hello?

LEE:  I, I'm typing.

ABDELQADER: Okay. I have to write this down on a piece of paper and send it. I'm gonna send you a text in a few.  Where's this going to.  You need, you need where this is going to, or - but it has, it has the name of the guy, too.

LEE: Yeah.

ABDELQADER: Supervisor Yory.

(R. 127, Transcript, PageID # 1089–92.)  Later that afternoon, Defendant and Abdelqader spoke on the phone again.  Defendant asked Abdelqader to come by her house and pick up the letter. Defendant told Abdelqader that she was hungry and out of cigarettes, and Abdelqader offered to bring her cigarettes and food.  Abdelqader later told Albanna, "whatever I say she will do," referring to Defendant.  (*Id.* at PageID # 1109.)  On July 30, 2014, Abdelqader asked Defendant to mail the letter.  In the same conversation, Abdelqader told Defendant he had $500 to give her, including $200 from Albanna.  On July 31, 2014, Abdelqader told Albanna, "I swear she is getting from me 200 to 300 a week. Cigarettes, chips, candy, and this and that; don't charge her." (*Id.* at PageID # 1141–42.)

In the letter, which Defendant wrote on Summit County Council letterhead, Defendant stated that she had "known George and his family for 10 years."  (Defendant Br. at 27.)  She claimed that she had "had numerous opportunities to work with and engage the family in the community on various issues related to the conduction of business."  (*Id.*)  Defendant also claimed that George's "family is often my eyes and ears to ensure that our residents and consumers are protected and treated fairly and I value their contribution."  (*Id.*)  In concluding, Defendant stated "I am not privy to the facts in this case but I want to state with surety that whatever has prompted this is a sort of aberration and not business as usual for this family. George is young and possibly naïve but I am certain that his father and family will be diligent in future oversight."  (*Id.*)  She closed the letter by stating, "I ask that you consider this letter and my confidence in the credibility of the family as you resolve the case."  (*Id.*)

**C.  FBI Investigation**

Defendant began to suspect that Albanna was recording her on August 28, 2014. On August 29, 2014, FBI officers searching Defendant's trash discovered that she had thrown away the letter she wrote to the IRS on behalf of Albanna's son George.  FBI agents then interviewed Defendant at her home on September 9, 2014.  At trial, one of the FBI agents testified that Defendant answered several of his questions untruthfully during that interview.  Defendant told the FBI agent, *inter alia*, that she "disclosed on her campaign finance report all contributions that were made to her;" that Abdelqader distributed invitations to Defendant's fundraisers when he collected donations for her; that she did not call Judge Larson; and that she had never spoken

with the prosecution regarding Abdelqader's nephews' case. (R. 132, Transcript, PageID # 1430–32.) The government presented evidence at the trial indicating that these statements were all untrue. Defendant also told the FBI agent that "anything that she received from Omar Abdelqader she would pay back after she got her paycheck and she'd pay him back on Fridays. And she also said if [the FBI] were to look at her Huntington Bank accounts [the FBI] would be able to confirm that." (*Id.* at PageID # 1434.) But when the FBI reviewed her bank records, they only showed two transactions where Defendant transferred a total of $46 from her bank accounts to Abdelqader's.

After the agents left, Defendant and Abdelqader spoke on the phone. Defendant and Abdelqader had the following conversation:

> LEE: The FBI just left my house.
>
> ABDELQADER: Uh huh. About what?
>
> LEE: Every letter I've ever done for you and your family.
>
> ABDELQADER: Yeah. They are, they was at my house too.
>
> LEE: You talk to them?
>
> ABDELQADER: Yeah. I talk to them. They ask me, you know, they ask me I said, you know, I know your husband. Me and your husband are good friends. And uh, they ask me if uh, there was any money was tra- you know, exchanged or I never give you s--t anyway. I never give you any do- any money anyway. So what's the problem.
>
> LEE: I told them, I said, if I need money and he knows I have a problem and he'll loan me money. But it's a loan. I have to pay that money back.
>
> ABDELQADER: Yeah. Absolutely. I mean, this, this, this -Exactly. There was nothing given for free, never anything (background: And you never did s--t for us).
>
> . . .
>
> ABDELQADER: Mrs. Tammy. We didn't do anything wrong.
>
> LEE: No.
>
> ABDELQADER: It was never, it was anything that was wrong that we have done. I never give you any money for free. I never, you never came in, you know none of that s--t so what do we have to worry for. We didn't do nothing wrong. What did we do wrong?
>
> LEE: No, I told them I said

ABDELQADER: Every time you come to the store and got stuff you paid for it. So, what's the problem. Because you a politician you cannot come to the store and lie.

LEE: I told them I said my relationship with him is because of a friend not because of my position on county council.

ABDELQADER: Yeah, this is exactly, this is exactly what it is Mrs. Tammy we didn't do nothing wrong. I mean they came in and tried.

(R. 127, Transcript, PageID #1179–80.)

## Procedural History

On December 8, 2015, the government filed an indictment against Defendant. Counts One through Four of the indictment charged Defendant with conspiracy to commit honest services mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, 1346, and 1349; honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346; Hobbs Act conspiracy, in violation of 18 U.S.C. § 1951; and Hobbs Act extortion, in violation of 18 U.S.C. § 1951. Counts Five and Six of the indictment charged Defendant with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2); and making a false statement to law enforcement officers, in violation of 18 U.S.C. § 1001(a)(2).

Defendant moved to dismiss Counts One through Four of the indictment after the Supreme Court decided *McDonnell*, 136 S. Ct. at 2355. Defendant argued that, post-*McDonnell*, the indictment did not allege sufficient facts to establish a violation of law on Counts One through Four. The district court denied the motion.

Lee pled not guilty and proceeded to trial in February of 2017. At the close of trial, Defendant moved for a judgment of acquittal under Fed. R. Crim. P. 29. Defendant argued that the government had failed to prove evidence of a conspiracy, a quid pro quo relationship between Defendant and Abdelqader, or obstruction of justice or false statements. Defendant also argued that the government had not provided evidence sufficient to satisfy the Supreme Court's standard for official acts as described in *McDonnell*, stating, "[t]he kinds of contacts that she's making with these people are the sorts of routine constituent services that the Supreme Court has said are not a violation of the statutes under which she's indicted." (R. 132, Transcript, PageID

#1469.)  The district court denied the motion.  The jury found Defendant guilty on all counts.  This appeal followed.

## DISCUSSION

### I.        Sufficiency of the Indictment

#### Standard of Review

This court reviews the sufficiency of an indictment *de novo*.  *United States v. Davis*, 306 F.3d 398, 411 (6th Cir. 2002).

#### Analysis

Defendant argues that Counts One through Four of her indictment should be vacated because they do not adequately lay out the elements of her alleged crimes.  The Supreme Court described the standard for testing the sufficiency of an indictment in *Hamling v. United States*, 418 U.S. 87, 117–18 (1974):

> [A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.  It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.  Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.

*Id.* (internal quotations and citations omitted); *accord United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007).  Further, "[t]he indictment must be read as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications. An indictment is to be construed liberally in favor of its sufficiency."  *McAuliffe*, 490 F.3d at 531.

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  Counts One through Four of

the indictment against Defendant charged her with committing honest services fraud and Hobbs Act extortion, under 18 U.S.C. §§ 1341, 1343, 1346, and 1951. Those charges require that the official acted with intent to deprive the public of honest services and that the official acted "under color of official right." *Id.* A conviction under these statutes requires either an "official act" in furtherance of the corrupt relationship or an agreement to perform an official act. *McDonnell*, 136 S. Ct. at 2367. An official act is "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *Id.* (quoting 18 U.S.C. § 201(a)(3)).

### A. "Official Act" as Defined in *McDonnell*

Defendant argues that the indictment against her should have been dismissed because it failed to adequately set forth official acts that she committed as part of the allegedly corrupt arrangement, as explicated by the Supreme Court in *McDonnell*. In *McDonnell*, the Court grappled with the question of what constitutes an "official act" for purposes of honest services fraud and Hobbs Act extortion. *McDonnell*, 136 S. Ct. at 2367–75. In that case, the Governor of Virginia had received over $175,000 in gifts and loans from a Virginia businessman, Jonnie Williams ("Williams"), who hoped the Governor would facilitate state-sponsored scientific studies of a nutritional supplement Williams planned to sell. *Id.* at 2364. The allegedly corrupt acts the Governor took in return for the gifts included introducing Williams to Virginia's Secretary of Health and Human Resources (the "Secretary"), hosting Williams at a lunch event with Virginia research scientists and discussing the nutritional supplement with them, passing from Williams to the Secretary a letter containing a proposed research protocol for studies on the nutrition supplement, and promoting the supplement at a meeting between the Governor and state officials concerning Virginia's health plan for state employees. *Id.* at 2362–64.

The Supreme Court determined that the Fourth Circuit had applied an incorrect standard to determine whether the Governor's actions constituted "official acts." *Id.* at 2375. The Fourth Circuit had upheld the district court's jury instruction that "official act" included "'acts that a public official customarily performs,' including acts 'in furtherance of longer-term goals' or 'in a series of steps to exercise influence or achieve an end.'" *Id.* at 2366 (quoting *United States v.*

*McDonnell*, 792 F.3d 478, 505–06 (4th Cir. 2015)). Instead, the Supreme Court in *McDonnell* identified a two-part test for an official act: "[f]irst, the Government must identify a question, matter, cause, suit, proceeding or controversy that may at any time be pending or may by law be brought before a public official. Second, the Government must prove that the public official made a decision or took an action on that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *McDonnell*, 136 S. Ct. at 2368 (internal quotation omitted). The Court determined that "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit [the] definition of official act." *Id.* at 2372 (internal quotation omitted). In contrast, "a decision or action to initiate a research study— or a decision or action on a qualifying step, such as narrowing down the list of potential research topics—would qualify as an 'official act.'" *Id.* at 2370.

Importantly, a public official did not actually have to perform an official act herself. An official could be culpable under the standard described in *McDonnell* if the official "use[d] his official position to exert pressure on *another* official to perform an "official act," or if the official "use[d] his official position to provide advice to another official, knowing or intending that such advice [] form the basis for an 'official act' by another official." *Id.* (emphasis in original). And the official could be convicted without actually taking those actions—without actually exerting pressure or providing advice to another official. *Id.* If a jury found the evidence to be sufficient to demonstrate that the defendant agreed to take an official act in exchange for the gifts, such a determination would be sufficient to support a guilty verdict. *Id.* The Supreme Court explained:

> Under this Court's precedents, a public official is not required to actually make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy"; it is enough that the official agree to do so. The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain. Nor must the public official in fact intend to perform the "official act," so long as he agrees to do so. A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an "official act" in return. It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an "official act" at the time of the alleged quid pro quo. The jury may consider a broad range of pertinent evidence, including the nature of the transaction, to answer that question. . . .

Of course, this is not to say that setting up a meeting, hosting an event, or making a phone call is always an innocent act, or is irrelevant, in cases like this one. If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act. A jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal . . . .

In sum, an "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so) — without more — does not fit that definition of "official act."

*Id.* at 2370–72 (internal citation omitted). Because the district court's jury instructions did not ensure that the jury reached its decision to convict within those parameters, the Supreme Court in *McDonnell* vacated the judgment of conviction and remanded for further proceedings. *Id.* at 2375.

**B. Defendant's Indictment**

Defendant argues that the indictment against her should have been dismissed because it did not include facts "to support the 'more' required by *McDonnell*." (Defendant Br. at 50.) According to Defendant, *McDonnell* should be read to create an unspoken new standard for determining when an official has "provide[d] advice" or "exert[ed] pressure" on another official to take an official act. (*Id.* at 44–47.) Defendant claims that an official can only "provide advice" to a second official if the first official is in an advisory role to the second, and an official can only "exert pressure" on a second official if the first official has "leverage or power" over the second official. (*Id.*) However, nowhere in *McDonnell* did the Supreme Court state that it was creating such a rule. *See generally McDonnell*, 136 S. Ct. 2355.

To support the proposition that the term "provides advice" requires an official to hold an advisory role, Defendant cites the Supreme Court's decision in *United States v. Birdsall*, 233 U.S. 223 (1914). In *Birdsall*, the Supreme Court found that fraud indictments were sufficient when the officials who had allegedly accepted bribes "were charged with the duty of informing and advising the Commissioner of Indian Affairs" concerning the relevant matter. *Id.* at 227. The Supreme Court in *McDonnell* stated that *Birdsall* was fully consistent with the decision in *McDonnell* because "[t]he 'official action' at issue in *Birdsall* was 'advising the Commissioner of Indian Affairs, contrary to the truth,' that the facts of the case warranted granting leniency to certain defendants convicted of 'unlawfully selling liquor to Indians.'" *McDonnell*, 136 S. Ct. at 2371 (quoting *Birdsall*, 233 U.S. at 227–30). Nowhere in *McDonnell* or *Birdsall* did the Court state that officials not holding advisory roles over other officials could not be convicted of honest services fraud or Hobbs Act extortion. The same is true of the Third Circuit's decision in *United States v. Repak*, 852 F.3d 230, 237 (3d Cir. 2017), in which the Third Circuit upheld a conviction of an official who held an advisory role. The fact that officials holding advisory roles have been convicted for accepting gifts in exchange for providing advice does not mean that holding an advisory role is necessary for such a conviction.

Defendant's argument that an official cannot "exert pressure" without holding a position with direct leverage over other officials is similarly uncompelling. To support that argument, Defendant cites the Second Circuit's decision in *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017). However, that case involved jury instructions, not an indictment, and the court remanded because "the District Court's instructions on honest services fraud and extortion d[id] not comport with *McDonnell* and [we]re therefore in error . . . [and] this error was not harmless because it [was] not clear beyond a reasonable doubt that a rational jury would have reached the same conclusion if properly instructed, as is required by law for the verdict to stand." *Id.* at 106. The district court in *Silver* had specifically instructed the jury that an official act "'*is not limited* to voting on a bill, making a speech, passing legislation, *it is not limited to that*,' but rather, includes '*any action* taken or to be taken under color of official authority'"—exactly what *McDonnell* determined was an incorrect interpretation of "official action." *Id.* at 118 (quoting district court jury instructions) (emphasis in original).

The Second Circuit in *Silver* did not conclude that the defendant, who at the time of the alleged acts was Speaker of the New York State Assembly, was unable to "exert pressure" due to a lack of official leverage over other officials when he sent an associate a letter on Assembly letterhead offering to help obtain permits for an event. *Id.* at 120. The Second Circuit found the jury instructions improper because a jury *could* have found that the defendant's "letter offering general assistance with an event occurring in his district—absent any actual 'exertion of pressure' on other officials regarding a particular matter under their consideration—did not satisfy the standards for an official act as defined by *McDonnell*." *Id.; see also United States v. Fattah*, 902 F.3d 197, 238–46 (3rd Cir. 2018) (*inter alia*, reversing conviction because improper jury instructions, written pre-*McDonnell*, could have resulted in jury conviction without finding that emails, letters, and phone call in support of ambassadorship constituted impermissible attempts to exert pressure or provide advice on a pending matter). The *Silver* court never indicated that it was reversing based on a finding that the defendant was unable to exert pressure on other officials because he lacked professional leverage over them.

Defendant also relies on *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), a case decided decades before *McDonnell*. *Id.* (abrogated on other grounds by *McNally v. United States*, 483 U.S. 350, 356 (1987)). *Rabbitt* concerned, *inter alia*, a member of the Missouri House of Representatives who took payments from an architectural firm in exchange for "recommend[ing] the [ ] firm as competent architects to persons authorized to employ architects for state projects." *Rabbitt*, 583 F.2d at 1020. On its face, *Rabbitt* provides some support for Defendant's position. The court in that case overturned Rabbitt's conviction, explaining: "[t]he Government failed to prove [the architectural firm] entertained a reasonable belief Rabbitt possessed effective control over the award of architectural contracts necessary to establish extortion 'under color of official right' in violation of the Hobbs Act." *Id.* at 1028. However, the *Rabbitt* decision provides minimal analysis supporting its decision to apply this requirement. *Id.* Circuit courts on two occasions have called *Rabbitt*'s logic into question. *See United States v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008) (avoiding the issue of "whether or not *Rabbitt* is correct"); *United States v. Holzer*, 816 F.2d 304, 308–09 (7th Cir. 1987) ("We very much doubt the soundness of this reasoning. The fact that the defendant did not control the award of contracts should not be decisive if his position as a state legislator gives his recommendations a weight

independent of their intrinsic merit.") (vacated on other grounds by *Holzer v. United States*, 484 U.S. 807 (1987)). Moreover, the Supreme Court in *McDonnell* did not cite *Rabbitt* once—a strange omission, if the Supreme Court was intending to adopt *Rabbitt*'s reasoning. *McDonnell*, 136 S. Ct. at 1355–75. We therefore decline to create additional restrictions on the meaning of "provide advice" and "exert pressure."

Furthermore, Defendant fails to address the fact that the standard for sufficiency of an indictment is not the same as that for a conviction. As explained above, an indictment is "read as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications. An indictment is to be construed liberally in favor of its sufficiency." *McAuliffe*, 490 F.3d at 531. The Sixth Circuit has stated that an indictment need not specifically state each factor of a charge that must be proven, as long as the facts alleged, taken together, support the elements of the charge. *See id.* at 531–32 ("[A]n indictment is not fatally insufficient for its failure to allege these elements *in haec verba*, if the facts alleged in the indictment warrant the inference of such elements.").

In *McAuliffe*, the defendant challenged the sufficiency of an indictment for mail fraud. *Id.* at 531. A charge of mail fraud required the government to prove that the defendant had used the mail "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *Id.* (quoting 18 U.S.C. § 1341). A necessary element of the crime is materiality of the falsehood: "[a] misrepresentation is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed." *Id.* (internal quotation omitted). The defendant in *McAuliffe* argued that the indictment was insufficient because it had not alleged that he had acted with intent to defraud or that his misrepresentations were material. *Id.* However, the Sixth Circuit found that the indictment was adequate because the facts alleged supported inferences of both intent and materiality. *Id.* at 532.

In *McAuliffe*, the Sixth Circuit also cited approvingly the Second Circuit's decision in *United States v. Klein*, 476 F.3d 111, 113–14 (2d Cir. 2007). In that case, the defendant challenged the sufficiency of an indictment that also failed to allege materiality, when "a bank fraud conviction required a showing that the fraudulent conduct was material, although the bank

fraud statute does not contain that actual word." *Id.* at 113. The Second Circuit in *Klein* found that the indictment was sufficient because "an allegation of materiality can be inferred from use of the word fraud in the indictment." *Id.*

As in *McAuliffe* and *Klein*, the government's indictment of Defendant in this case contains sufficient facts to notify Defendant of the charges against her and enable her to plead double jeopardy if charged for the same crime and facts in a future proceeding. *See Hamling*, 418 U.S. at 117. Defendant's indictment alleges, *inter alia*, that she took "official action" to benefit Abdelqader by helping him "achieve favorable outcomes in judicial and administrative proceedings," and it sets out facts supporting those allegations. (R. 3, Indictment, PageID # 14–42.) For example, the indictment includes the transcript of a conversation between Defendant and a local prosecutor, in which Defendant asks why the unidentified man in the altercation with Abdelqader's nephews had not been charged as well, and states "I'm not trying to influence you, you can't say I'm trying to influence you. I'm trying to make you think. That's all I'm trying to do; just trying to make you think." (*Id.* at 30.) At a minimum, the indictment supports an inference that Defendant had agreed to perform an official act or pressure or advise other officials to perform official acts in exchange for gifts or loans from Abdelqader. *See McDonnell*, 136 S. Ct. at 2370–71 ("Under this Court's precedents, a public official is not required to actually make a decision or take an action on a question, matter, cause, suit, proceeding or controversy; it is enough that the official agree to do so." (internal quotations omitted)). Therefore, the indictment sufficiently alleges the elements of Counts One through Four, and district court did not err in denying Defendant's Motion to Dismiss the Indictment.

## II.     Sufficiency of the Evidence

### Standard of Review

The Sixth Circuit in *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016), described the standard for reviewing a district court's denial of a motion for acquittal based on insufficiency of the evidence:

> We review a district court's denial of a motion for judgment of acquittal de novo, assessing whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt. In so doing, we draw all reasonable inferences in support of the jury's verdict and will reverse a judgment for insufficient evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole. Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred. In sum, a defendant claiming insufficiency of the evidence bears a very heavy burden.

(internal quotations and citations omitted) (emphasis in original). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Odum*, 878 F.3d 508, 515 (6th Cir. 2017) (internal quotations omitted). "In analyzing such a claim, we do not weigh the evidence, evaluate witness credibility, or displace the jury's judgment with our own." *United States v. Wagner*, 382 F.3d 598, 610–11 (6th Cir. 2004).

## Analysis

Defendant makes three separate arguments to support her case. First, Defendant claims the government failed to allege facts sufficient to sustain Defendant's conviction on Counts One through Four. Second, Defendant claims that the government failed to allege facts sufficient to sustain Defendant's conviction on Counts Five and Six. Finally, Defendant argues that if this Court vacates Defendant's conviction for Counts One through Four but upholds her conviction for Counts Five and Six, this Court should vacate Defendant's sentences on Counts Five and Six and remand for re-sentencing. We address each argument in turn.

### A. Sufficiency of the Evidence on Counts One through Four

Defendant argues that the district court erred by refusing to grant her motion for judgment of acquittal after the close of evidence. Defendant claims that the district court should have granted acquittal because "the government [] failed to present evidence that Lee had actually exerted pressure on, had the power or leverage to exert pressure on, or was in an advisory role with, the other officials." (Defendant Br. at 51.) Defendant argues that the jury could have reached a guilty verdict for improper reasons, because the district court did not instruct the jury that, in order to convict, it was required to find that Defendant held an advisory

role or held power or leverage over the officials with whom she communicated.  But the jury instructions that the district court gave were consistent with both *McDonnell*'s narrow definition of "official act" and Defendant's proposed instructions, and Defendant raised no objection to those instructions when they were presented to the jury.[3] More importantly, as discussed above, we do not adopt Defendant's additional constraints on the requirements for an official to "provide advice" or "exert pressure" on another official.

Moreover, Defendant bases her argument on an incorrect standard of law.  The government did not have to prove beyond a reasonable doubt that Defendant actually took official action or provided advice to or exerted pressure on another official to take an official action.  Instead, the evidence was sufficient if it could have led a rational juror to conclude beyond a reasonable doubt that Defendant agreed to perform one of those actions in exchange for bribes from Abdelqader.  *See McDonnell*, 136 S. Ct. at 2370–71.  As the Court in *McDonnell* explained:

> Under this Court's precedents, a public official is not required to actually make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy'; it is enough that the official agree to do so.  The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain.  Nor must the public official in fact intend to perform the 'official act,' so long as he agrees to do so.  A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return.  It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged quid pro quo.

*Id.* at 2370–71 (citations omitted).  The district court did not err in denying the motion for acquittal, because the evidence was sufficient for a rational juror to conclude beyond a reasonable doubt that Defendant agreed to perform official acts or pressure or advise other officials to perform official acts in exchange for gifts.  The government was not required to prove that Defendant actually did successfully perform official acts or pressure or advise other officials to do so.

---

[3]Defendant stated after the jury instructions were read: "We would like to continue to use the Sixth Circuit Pattern Jury Instructions as updated in 2016," and agreed when the government stated "[Defendant] objected to any additions to the Sixth Circuit Pattern Jury Instructions."  (R. 164, Transcript, PageID # 1722–23.)

And while Defendant spends a substantial portion of her brief arguing that *McDonnell*'s facts compel a conclusion that the evidence was insufficient in this case, the Supreme Court in *McDonnell* never determined that the facts in that case were necessarily insufficient. Rather, the Court stated that "hosting an event, meeting with other officials, or speaking with interested parties is not, standing alone, a 'decision or action'" that could support a quid pro quo corruption conviction. *McDonnell*, 136 S. Ct. at 2370. Therefore,

> [s]imply expressing support for the [Anatabloc] research study at a meeting, event, or call—or sending a subordinate to such a meeting, event, or call— similarly does not qualify as a decision or action on the study, *as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an 'official act.'*

*Id.* at 2371 (emphasis added). So if the jury credited testimony presented at Governor McDonnell's trial that he had not expected anything from his subordinates other than to attend meetings with Walker, then Governor McDonnell's conviction would have been based on improper grounds. *Id.* at 2374. However, the Supreme Court specifically recognized that "[t]he jury may have disbelieved that testimony or found other evidence that Governor McDonnell agreed to exert pressure on those officials to initiate the research studies or add Anatabloc to the state health plan," and the jury could have properly convicted on those grounds. *Id.* at 2375.

In sum, the Supreme Court remanded because the jury instructions were overbroad, which meant that the jury could have convicted McDonnell for conduct that was not unlawful; but the jury also could have convicted McDonnell for proper reasons based on the jury's evaluation of the evidence presented. *Id.* at 2374–75. Because the jury in the case at hand was properly instructed under *McDonnell*, the district court did not have to grant Defendant's motion for acquittal simply due to similarities between the facts of this case and of the facts in *McDonnell*.

The evidence presented at Defendant's trial was sufficient for a rational juror to have concluded beyond a reasonable doubt that Defendant either performed or agreed to perform an official act or to pressure or advise another official to perform an official act, as construed by the Supreme Court in *McDonnell*. As explained above, "[this Court] do[es] not weigh the evidence, evaluate witness credibility, or displace the jury's judgment with [its] own." *Wagner*, 382 F.3d

at 610–11.  It is immaterial whether this Court would have found Defendant guilty, as long as there was sufficient evidence presented at trial for a rational juror to have reached that conclusion beyond a reasonable doubt.  *Id.*

At trial, the government presented evidence that, *inter alia*, Defendant called the chief prosecutor for the city of Akron (the boss of the prosecutor in charge of Abdelqader's nephews' case) and asked why charges had not been brought against the unidentified man in the confrontation with Abdelqader's nephews.  The government presented evidence that as part of that conversation, Defendant stated "I'm not trying to influence you, you can't say I'm trying to influence you.  I'm trying to make you think.  That's all I'm trying to do; just trying to make you think."  (R. 132, Transcript, PageID # 1378.)  A juror could easily have heard those words and concluded that they meant the exact opposite—that Defendant was, in fact, trying to influence the prosecutor.  Moreover, the prosecutor testified that she believed if she did not return Defendant's calls, that Defendant "might go over [the prosecutor's] head and contact [her] supervisor," the law director for the city of Akron, and that Defendant had never contacted her in such a way regarding other cases.  (*Id.* at 1388.)

The government also presented evidence that Abdelqader told his brother he had given Defendant $200 and had promised to give her an additional $300 if she "finish[ed] up this matter."  (R. 126, Transcript, PageID # 924–26.)  The jury certainly could have discounted this evidence or interpreted it in a different way, but a rational juror could have interpreted this evidence and other evidence the government presented as establishing a quid pro quo arrangement, as clarified by *McDonnell*, beyond a reasonable doubt.  The jury could rationally have concluded beyond a reasonable doubt based on this evidence that Lee agreed to or "intend[ed] to exert pressure on [the prosecutor] or provide advice, knowing or intending such advice to form the basis for an 'official act,'" namely, opening charges against the unidentified man in the altercation with Abdelqader's nephews.  *McDonnell*, 136 S. Ct. at 2371. A prosecutor bringing charges against a defendant is certainly within the meaning of "official act" regarding a "question, matter, cause, suit, proceeding, or controversy," as defined by *McDonnell*. *Id.* at 2374.  In fact, the Supreme Court in *McDonnell* specifically recognized that "an 'official act' is a decision or action on a 'question, matter, cause, suit, proceeding or

controversy' . . . [that] must involve a formal exercise of government power that is similar in nature to a lawsuit before a court [or] a determination before an agency"—exactly the types of matters with which Defendant interfered. *Id.* at 2372. The district court did not err in denying Defendant's motion for acquittal on Counts One through Four, because the evidence was sufficient for a rational juror conclude beyond a reasonable doubt that Defendant had agreed to or had in fact pressured or advised other officials to perform official acts in exchange for receiving things of value from Abdelqader.

## B. Sufficiency of the Evidence on Counts Five and Six

Defendant next claims that the district court erred in denying her motion for acquittal on Counts Five and Six. Under Counts Five and Six, Defendant was found guilty of obstruction of justice and false statements to law enforcement. To sustain a conviction for obstruction of justice under 18 U.S.C § 1512(c)(2) and false statements to law enforcement officers under 18 U.S.C. § 1001(a)(2), the government was required to show that Defendant acted with intent. *See United States v. Jeter*, 775 F.2d 670, 675–76 (6th Cir. 1985); *United States v. Siemaszko*, 612 F.3d 450, 462 (6th Cir. 2010).

Defendant argues that "no rational juror could have concluded that Lee intentionally sought to obstruct justice or lie to law enforcement officers." (Defendant Br. at 57.) In support of Defendant's argument that the evidence was not sufficient for a rational juror to conclude beyond a reasonable doubt that she was guilty on Counts Five and Six, Defendant cites the fact that "[t]he testifying FBI agent acknowledged several times in her testimony that Lee appeared to be 'all over the place,' and that sometimes her answers conflicted and they could be construed as truthful." (*Id.* at 58.) However, just because the jury *could have* interpreted the evidence to indicate that the government had not proven Defendant guilty of Counts Five and Six beyond a reasonable doubt does not mean that the jury *had to* evaluate the evidence that way. Again, "[this Court] do[es] not weigh the evidence, evaluate witness credibility, or displace the jury's judgment with [its] own." *Wagner*, 382 F.3d at 610–11.

"[D]raw[ing] all available inferences and resolv[ing] all issues of credibility in favor of the jury's verdict," a rational juror could have concluded, based on the evidence at trial, that

Defendant intentionally obstructed justice and lied to law enforcement agents. *United States v. Bankston*, 820 F.3d 215, 235 (6th Cir. 2016) (internal quotations omitted). The government presented evidence that after Defendant became suspicious that she was being recorded, Defendant threw away a letter she had written to the IRS on behalf of Albanna's son. The government also presented evidence that Defendant falsely told an FBI agent that "she disclosed on her campaign finance report all contributions that were made to her;" that she falsely told the agent that Abdelqader distributed invitations to Defendant's fundraisers when he collected donations for her; that she falsely told the agent that she did not call Judge Larson; and that she falsely told the agent she had never spoken with the prosecution regarding Abdelqader's nephews' case. (R. 132, Transcript, PageID # 1430–32.) These are only some of the examples of evidence the government presented indicating that Defendant deliberately sought to obstruct justice and made false statements to law enforcement officers. The jury could have determined, based on its own evaluation of the credibility of the evidence, that the evidence on Defendant's behalf was more compelling than the evidence the government presented. However, the government presented ample evidence at trial upon which a rational juror could have based a conclusion beyond a reasonable doubt that Defendant met the intent requirement of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 1001(a)(2). Therefore, the district court did not err in refusing to grant Defendant's motion for acquittal on Counts Five and Six.

## C. Resentencing on Counts Five and Six

Finally, Defendant asserts that if this Court "vacates Counts One through Four, but not Counts Five and Six, the Court should vacate the sentences on Counts Five and Six and remand the case for resentencing." (Defendant Br. at 59.) *See United States v. Clements*, 86 F.3d 599, 601 (6th Cir. 1996). For the reasons discussed above, we do not vacate Counts One through Four, so we need not remand for resentencing on Counts Five and Six.

**CONCLUSION**

Because the indictment against Defendant sufficiently alleged the elements of honest services fraud and Hobbs Act extortion, we **AFFIRM** the district court's decision that the indictment was sufficient. And because the government presented sufficient evidence to allow a

rational juror to conclude beyond a reasonable doubt that Defendant was guilty on all counts, we **AFFIRM** Defendant's convictions. Because we do not vacate Defendant's sentence on Counts One through Four, we also deny her request to remand for resentencing.

———————————

**CONCURRENCE**

———————————

NALBANDIAN, Circuit Judge, concurring. I concur in the lead opinion, which accurately sets forth the governing law and, I believe, reaches the correct result under that law. Nevertheless, I am troubled by this case and write separately to explain why. To be clear, there is nothing admirable or praiseworthy, to say the least, about defendant Tamela Lee's conduct. Lee very plainly traded on her status as an elected official to receive remuneration in a way that certainly "looks" illegal. But the question here is whether what she did was illegal under federal (not state) law and whether she must serve significant time in federal prison for what she did. Although I concur with the lead opinion in this case, I express two specific reservations.

First, the main question in this case is whether Lee received the relevant gifts in exchange for performing an "official act." There is no dispute that Lee herself did nothing official: she took no action that would fall under the official responsibilities or duties of a Summit County Council member. Instead, the government alleged that Lee agreed to influence the official acts of others with regard to a state criminal case and an IRS investigation. But trying to influence someone else's official acts and performing one's own official acts would seem to be entirely different.

The government's theory, though arguably inconsistent with what the statutes actually say, is consistent with what the Supreme Court said in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), about the federal bribery statute, 18 U.S.C. § 201. Namely, that a public official can be culpable if he attempted to exert pressure on a different public official to influence that public official in the performance of an official act. *McDonnell*, 136 S. Ct. at 2370. For that proposition, the *McDonnell* Court relies on its own decision in *United States v. Birdsall*, 233 U.S. 223 (1914). But I question whether *Birdsall* should be read so broadly.

*Birdsall* concerns a scheme involving two subordinate officers, appointed by the Commissioner of Indian Affairs, who accepted bribes in exchange for attempting to influence the Commissioner. *Id.* at 229. But *Birdsall* differs from this case in this important respect:

in *Birdsall*, the subordinate officers were responsible for advising the Commissioner—the same person whom they sought to influence. Indeed, the Court explained that "by the regulations and established requirements of the Department of Interior [the officials] were charged with the duty of informing and advising the Commissioner of Indian Affairs" regarding the matters involved in the case. *Id.* at 228. And the Court stated that the public officials had been charged with receiving money "with the intent that their *official action* should be thus influenced." *Id.* at 230 (emphasis added). Subordinates who must advise their superiors as part of their official duties are, in fact, performing "official acts."[1]

The Court's holding in *Birdsall* does not support the much broader proposition that any public official who tries to influence another public official takes an "official act" herself, regardless of the relationship between the two officials. To say that Lee is positioned with respect to the IRS, for example, in the same way that the officials in *Birdsall* were positioned with respect to the Commissioner of Indian Affairs, is a stretch. Yet it appears to be a stretch that *McDonnell* permits.

That leads to my second concern. Assuming that one reads the federal bribery statute broadly to encompass attempts to influence that are outside the scope of a defendant's official responsibilities, it would make sense to look for a limiting principle. Here, Lee suggests that a culpable public official must at least have some leverage over the public official that she is attempting to influence. Of course, there is nothing in the federal bribery statute that would require such leverage, but the statute does not seem to strictly prohibit one public official's attempts to pressure another public official into taking an official act, either. In effect, Lee's proposed leverage requirement would cabin the broad implications of the "influence" or "advice" theories generally.

Nevertheless, as the lead opinion recognizes, the Supreme Court has not recognized a leverage requirement, leaving the broader implications of *McDonnell* in place. To be sure, the

---

[1]The Court also noted that it was not necessary that the duties of the subordinates be "prescribed by a written rule or regulation." *Birdsall*, 233 U.S. at 231. Those "duties" could be "fixed" by "established usage which constituted the common law of the Department" or by "settled practice." *Id*. But that would make their actions no less official.

*McDonnell* Court rejected the even broader theories that the government tried to proffer with regard to the meaning of "official act."  But in so doing, I believe, the Court left in place equally broad (and questionable) theories in the particular influence scenarios that this case addresses.